**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| ANDREW WOMMACK MINISTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| JARED POLIS, in his official capacity as the | ) | |
| Governor of the State of Colorado, JILL | ) | |
| HUNSAKER RYAN, in her official capacity as | ) | |
| Executive Director of the Colorado Department | ) | |
| of Public Health and Environment, JACQUELINE | ) | |
| REVELLO, in her official capacity as Director of | ) | |
| Teller County Department of Public Health and | ) | |
| Environment, | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,
<u>DECLARATORY RELIEF, AND DAMAGES</u>**

For its VERIFIED COMPLAINT against Defendants, JARED POLIS, in his official capacity as Governor of the State of Colorado ("Governor" or "Governor Polis"), JILL HUNSAKER RYAN, in her official capacity as Executive Director of the Colorado Department of Health and Environment ("Director Ryan"), and JACQUELINE REVELLO, in her official capacity as Director of Teller County Department of Public Health and Environment ("Director Revellio") (collectively "Defendants"), Plaintiff, ANDREW WOMMACK MINISTRIES, INC. ("AWMI") alleges and avers as follows:

**URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER
<u>AND PRELIMINARY INJUNCTION</u>**

1.      In its Prayer for Relief, *infra*, and in the contemporaneously filed Motion for Temporary Restraining Order and Preliminary Injunction, AWMI seeks a temporary restraining

order and preliminary injunction restraining enforcement against AWMI of the various COVID-19 orders issued by Governor Polis, Director Ryan, and other government officials in the State of Colorado:

(a)     Restricting AWMI from hosting religious gatherings, events, conferences, ministries, and activities if the number in attendance exceeds arbitrarily imposed numerical limitations and capacity limitations that are not imposed on numerous nonreligious gatherings of like kind;

(b)     Imposing discriminatory and disparate prohibitions on the types of activities that AWMI may engage in at their own facilities, as the orders allow AWMI to feed the hungry, clothe the naked, house the homeless, provide other material social services and necessities of life to an unlimited number of individuals with unlimited volunteers in a single facility, but **the Orders prohibit AWMI from engaging in a religious conference, ministry, event, gathering, or service with the same individuals in the same facility, on pain of criminal penalties**;

(c)     Treating AWMI's religious conferences, events, meetings, ministries, and other gatherings differently that the encouragement, support, and allowance of thousands of individuals to gather in various protests around Colorado;

(d)     Prohibiting AWMI and its ministers, staff, volunteers, and attendees from attending to religious worship services and doing so against their will and sincerely held religious belief.

2.      A temporary restraining order and preliminary injunction are necessary to protect these vitally important and constitutionally protected liberties, even in the midst of disease.

3.      Additionally, while the Governor has unilaterally and significantly restricted the number of individuals permitted to assemble or participate in AWMI's religious activities, he has excused from such restrictions untold thousands of protesters who have gathered all throughout Colorado cities, with no social distancing, and with no threat of criminal or legal sanction. And, **the Governor explicitly commended such large gatherings of protesters as exemplars of First Amendment activity while expressly relegating the religious exercise of houses of worship like AWMI to disfavored status in his orders**.

4.      The Governor's Orders interfere with and place a cloud of potential criminal and civil legal action over AWMI's upcoming Pastor's Conference scheduled to begin at 7:00 PM on October 5, 2020. In addition to outside pastors and ministers who are invited to the conference, attendance at the conference is a required part of the education program for all 652 students at Charis Bible College. Without immediate relief, participants who work or attend the conference will be hindered in their ability to worship, minister, teach, learn, and otherwise exercise their sincerely held religious beliefs freely according to conscience by fear of being subjected to criminal or civil sanctions or penalties. Without immediate relief, pastors and ministers who would otherwise attend the conference, including those who would have to make travel and lodging arrangements now in order to attend, will avoid the conference for fear of being subjected to criminal or civil sanctions or penalties.

5.      And, although AWMI always welcomes and plans to accommodate a certain number of 'walk-in' attendees, each day the Governor's Orders hang over the conference lowers the number of registrations and increases the likelihood of walk-in attendees, which interferes with AWMI's ability to adequately staff the conference to ensure participant safety in accordance with

its self-imposed, enhanced distancing and sanitization protocols to protect against spread of COVID-19.

6.     In short, without immediate relief, the Governor's Orders will have a chilling effect on the Free Exercise, Free Speech, and Free Assembly rights of AWMI and conference participants, and will interfere with AWMI's ability to provide them a safe experience

### A.     Numerous Courts Have Enjoined Similar Covid-19 Restrictions And Prohibitions On Religious Worship And Religious Gatherings.

7.     At around the same time that Governor Polis's Executive Orders and the State's Public Health Orders regarding COVID-19 were being used to threaten criminal sanctions on AWMI, officials in other jurisdictions had similarly threatened to impose criminal sanctions on other religious gatherings. Twice in two weeks the Sixth Circuit Court of Appeals enjoined enforcement of executive orders like the Governor's orders, determining that restrictions on drive-in **and in-person** worship services violate the First Amendment. *See Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (**in-person** worship services); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) (holding plaintiffs likely to succeed on merits of First Amendment and Kentucky RFRA claims for both drive-in and **in-person** services). Also, in *First Pentecostal Church v. City of Holly Springs, Miss.*, 959 F.3d 669 (5th Cir. 2020), the Fifth Circuit Court of Appeals granted an injunction pending appeal to a Mississippi church, enjoining enforcement of the Mississippi Governor's order restricting religious gatherings.

8.     In *Roberts*, the Sixth Circuit granted an IPA enjoining the Kentucky Governor from enforcing executive orders prohibiting a church's in-person worship services when "serial exemptions for secular activities pose comparable public health risks." 958 F.3d at 414. In determining the Plaintiff's likely success on the merits of their free exercise claims, the court

recognized, "On one side of the line, a generally applicable law that incidentally burdens religious practice usually will be upheld." *Id.* at 413 (citing *Emp't Div. v. Smith*, 494 U.S. 872, 879–79 (1990)). But, the court concluded the Kentucky orders "likely fall on the prohibited side of the line," where "a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'" *Id.* (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1993)).

9.   Expanding on the problems with Kentucky's orders, the court explained,

> **Do the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws? We think so.** As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law. At some point, **an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny**.

*Id.* at 413–14 (cleaned up) (emphasis added).

10.   Continuing, the court reasoned, "Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers." *Id.* at 414. Thus, the court rejected the Governor's suggestion "that the explanation for these groups of people to be in the same area—intentional worship—creates greater risks of contagion than groups of people, say, in an office setting or an airport," *id.* at 416, further explaining,

> the reason a group of people go to one place has nothing to do with it. Risks of contagion turn on social interaction in close quarters; the virus does not care why they are there. So long as that is the case, why do the orders permit people who practice social distancing and good hygiene in one place but not another for similar lengths of time? It's not as if law firm office meetings and gatherings at airport terminals always take less time than worship services.

*Id.*

11.     The *Roberts* court also rejected the notion that the Governor's orders were justified because congregants could simply worship online via Facebook, reasoning,

> Who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name," Matthew 18:20, or what it means when "not forsaking the assembling of ourselves together," Hebrews 10:25.

> [T]he Free Exercise Clause does not protect sympathetic religious practices alone. And that's exactly what the federal courts are not to judge—how individuals comply with their own faith as they see it.

*Id.* at 415 (citation omitted).

12.     A week after the Sixth Circuit's *Roberts* decision, the Eastern District of North Carolina issued a TRO enjoining the North Carolina Governor from enforcing a 10-person limit on religious worship because it violated the Free Exercise Clause. *See Berean Baptist Church v. Cooper*, No. 4:20-cv-81-D, 2020 WL 2514313 (E.D.N.C. May 16, 2020) [hereinafter *Berean Baptist*]. In granting the TRO, the court noted upfront, "**There is no pandemic exception to the Constitution of the United States or the Free Exercise Clause of the First Amendment**." 2020 WL 2514313, at *1 (emphasis added).

13.     The North Carolina "stay-at-home" orders challenged in *Berean Baptist* provided exemptions from their 10-person gathering limits for numerous "Essential Business and

Operations." *Id.* at *3. But, the North Carolina orders subjected worship services to a 10-person limit that was not imposed on any of the myriad "Essential" businesses and activities. 2020 WL 2514313, at *4. The *Berean Baptist* court observed that the uniquely restrictive 10-person limit for worship gatherings "represent[s] precisely the sort of 'subtle departures from neutrality' that the Free Exercise Clause is designed to prevent." *Id.* at *6 (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)).

14.     The court observed further,

> Eleven men and women can stand side by side working indoors Monday through Friday at a hospital, at a plant, or at a package distribution center and be trusted to follow social distancing and hygiene guidance, but those same eleven men and women cannot be trusted to do the same when they worship inside together on Saturday or Sunday. "The distinction defies explanation . . . ."

*Id.* at *8 (quoting *Roberts*, 958 F.3d at 414).

15.     Thus, the court concluded, "These **glaring inconsistencies** between the treatment of religious entities and individuals and non-religious entities and individuals take [the orders] outside the 'safe harbor for generally applicable laws.'" *Id.* (quoting *Roberts*, 958 F.3d at 413).

16.     Ultimately, in concluding the North Carolina orders could not pass strict scrutiny, the *Berean Baptist* court recognized that the plaintiffs "simply want the Governor to afford them the same treatment as they and their fellow non-religious citizens receive when they work at a plant, clean an office, ride a bus, shop at a store, or mourn someone they love at a funeral." *Id.* at *9 (citing *Lukumi*, 508 U.S. at 546 ("The proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree.")).

17. In Louisville, Kentucky, the government threatened to use police to impose criminal sanctions on those individuals found in violation of similar COVID-19 orders and threatened to impose various sanctions on individuals found in violation of such orders. The United States District Court for the Western District of Kentucky found that the mere threat of such criminal sanction warranted a TRO. See *On Fire Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020) [hereinafter *On Fire*]. The *On Fire* TRO enjoined the Mayor of Louisville from "enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire." *Id.* at *1 (emphasis added).

18. Additionally, the Governor of Kansas had imposed a similar restriction on religious gatherings in Kansas, stating that "gatherings" of more than 10 individuals are prohibited, including religious gatherings. On April 18, 2020, the United States District for the District of Kansas issued a TRO enjoining Kansas officials from enforcing its discriminatory prohibition on religious gatherings and required the government to treat "religious" worship services the same as other similar gatherings that are permitted. See *First Baptist Church. v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, *6–7 (D. Kan. Apr. 18, 2020) [hereinafter *First Baptist*]. The *First Baptist* TRO specifically stated that the government's disparate treatment of religious gatherings was a violation of the Free Exercise Clause because it showed that "**religious activities were specifically targeted for more onerous restrictions than comparable secular activities**," and that the churches had shown irreparable harm because they would "be prevented from gathering for worship at their churches" during the pendency of the executive order. *Id.* at *7–8 (emphasis added).

19.     In discussing the Kansas orders, which imposed a 10-person limit on in-person gatherings, the court said that specifically singling out religious gatherings for disparate treatment while permitting other non-religious activities "show[s] that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral," *First Baptist*, 2020 WL 1910021, at *7, and—much like here—"**churches and religious activities appear to have been singled out among essential functions for stricter treatment**. It appears to be the only essential function whose core purpose—association for the purpose of worship—had been basically eliminated." *Id.* (emphasis added). Thus, the court found that a TRO was necessary and enjoined Kansas from enforcing its orders' disparate terms against churches. Indeed, "it goes without saying that the government could not lawfully expressly prohibit individuals from meeting together for religious services." *Id.* at *6 (emphasis added).

**B.     Numerous Courts Have Found That Permitting Mass Gatherings For Protests, Rioting, And Looting, While Prohibiting Religious Gatherings Is Constitutionally Impermissible Under The First Amendment.**

20.     Also, several courts have found that the government's open encouragement of protesters flouting the various COVID-19 gathering restrictions across the country and the concomitant refusal by government officials to impose similar threats of criminal sanctions upon such massive gatherings while simultaneously threatening religious worship services that exceed the arbitrary numerical limitations represents a gross violation of the First Amendment.

21.     The constitutional incongruity of Governor Polis's encouragement of protesters while restricting worshippers was highlighted by Judge Ho of the Fifth Circuit in his concurrence in *Spell v. Edwards*, 962 F.3d 175 (5th Cir. 2020), where the court dismissed as moot an appeal

arising from a church's challenge to Louisiana's stay-at-home orders restricting worship services to 10 people. 962 F.3d at 177. Judge Ho first recounted,

> At the outset of the pandemic, public officials declared that the *only* way to prevent the spread of the virus was for everyone to stay home and away from each other. They ordered citizens to cease all public activities to the maximum possible extent—even the right to assemble to worship or to protest

*Id.* at 180-81 (Ho., J., concurring).

22.     Then, he observed, "But circumstances have changed. In recent weeks, officials have not only tolerated protests—they have encouraged them . . . ." *Id.* at 181. And he posed a question:

> For people of faith demoralized by coercive shutdown policies, that raises a question: If officials are now exempting protesters, how can they justify continuing to restrict worshippers? **The answer is that they can't.** Government does not have carte blanche, even in a pandemic, to pick and choose which First Amendment rights are "open" and which remain "closed."

*Id.* (emphasis added).

23.     Judge Ho noted that, "To survive First Amendment scrutiny, however, those orders must be applied consistently, not selectively. And it is hard to see how that rule is met here [in light] of the recent protests." *Id.* at 182.

24.     He continued, "It is common knowledge, and easily proved, that protesters do not comply with social distancing requirements. But instead of enforcing the Governor's orders, officials are **encouraging the protests**—out of an admirable, if belated, respect for First Amendment rights." *Id.*

25.     As the Constitution demands, Justice Ho explained that: "If protests are exempt from social distancing requirements, then worship must be too." *Id.* (emphasis added).

26.     Of particular relevance to Plaintiff's claims herein, Judge Ho cited a brief filed by the United States in similar case against Governor Newsom in observing that "California's political leaders have expressed support for such peaceful protests and, from all appearances, have not required them to adhere to the now-operative 100-person limit . . . . **It could raise First Amendment concerns if California were to hold other protests to a different standard**." *Id.* (emphasis added). Indeed, the same principle Governor Polis applies to protesters "**should apply to people of faith**." *Id.* (emphasis added).

27.     Much like the Governor here, "support for the protests reflects a commendable commitment to equality. But public officials cannot devalue people of faith while elevating certain protesters. That would offend the First Amendment—not to mention the principle of equality for which the protests stand." *Id.* at 183 (emphasis added).

28.     As Judge Ho stated, "The point here is that state and local officials gave [protesters] the choice," to ignore the prohibitions on gathering. *Id.* "Those officials took no action when protesters chose to ignore health experts and violate social distancing rules. **And that forbearance has consequences**." *Id.* (emphasis added).

29.     The consequences Judge Ho referred to are that,

The First Amendment does not allow our leaders to decide which rights to honor and which to ignore. In law, as in life, what's good for the goose is good for the gander. **In these troubled times, nothing should unify the American people more than the principle that freedom for me, but not for thee, has no place under our Constitution**.

*Id.* (emphasis added).

30.     Similarly, as recounted in *Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D.N.Y. June 26, 2020), the Governor of New York and the New York City Mayor

openly encouraged protesters gathering in large numbers in New York, 2020 WL 3488742, *4–5, while continuing to prohibit in-person religious gatherings. *Id.* at *5-6.

31.     The Northern District of New York issued a preliminary injunction enjoining the enforcement of the "ever changing maximum number of people" for religious worship because the disparate treatment for protesters as compared to religious congregants in worship services violated the First Amendment. *Id.* at *8 ("[I]t is plain to this court that the broad limits of that executive latitude have been exceeded.").

32.     The court found that a restriction of 25% capacity for indoor worship services that is not applied equally to non-religious businesses and certainly not applied to protesters removes the law from general applicability and thus mandates strict scrutiny. *Id.* at *11.

33.     With respect to openly supporting protesters, rioters, and looters while imposing draconian restrictions on indoor religious worship services, the court noted that "Mayor de Blasio's simultaneous pro-protest/anti-religious gatherings message . . . clearly undermines the legitimacy of the proffered reason for what seems to be a clear exemption, no matter the reason." *Id.*, at *12.

34.     Indeed,

Governor Cuomo and Mayor de Blasio could have just as easily discouraged protests, short of condemning their message, in the name of public health and exercised discretion to suspend enforcement for public safety reasons instead of encouraging what they knew was a flagrant disregard of the outdoor limits and social distancing rules. They could have also been silent. **But, by acting as they did, Governor Cuomo and Mayor de Blasio sent a clear message that mass protests are deserving of special treatment.**

*Id.* at *12 (emphasis added).

35.    Because the government in New York treated protesters differently and more favorably than religious gatherings, the court held that such disparate treatment violated the Free Exercise Clause and issued a preliminary injunction. *Id.* at *13.

C.    **The Indefinite And Perpetually Re-Issued Covid-19 Orders From Governor Polis Have Turned Emergency Discretion Into An Impermissible Government By Executive Fiat, Which Represents A Fatal Threat To Constitutional Liberties.**

36.    The indefinite duration of Governor Polis's COVID-19 Executive Orders and directives also risks subjugating cherished constitutional rights to the dustbin of constitutional history by virtue of unchecked executive fiat. Such a regime is wholly foreign to the American experiment.

37.    Under the First Amendment, not to mention the entire regime established by the Constitution, a governor is not permitted to use exigent and emergent circumstances to curtail the democratic process in perpetuity and extend his unchecked authority over the lives of the citizens of his state into an undemocratic reign of government by executive whim.

38.    "Although the *Jacobsen* [ *v. Massachusetts*, 197 U.S. 11 (1905)] Court unquestionably afforded a substantial level of deference to the discretion of state and local officials in matters of public health, it did not hold that discretion limitless." *County of Butler v. Wolf*, No. 2:20-cv-677, 2020 WL 55106990, *6 (W.D. Pen. Sept. 14, 2020). And, since the time *Jacobsen* was decided well over a century ago, "there has been substantial development of federal constitutional law in the area of civil liberties [and] this development has seen a jurisprudential shift whereby federal courts **have given greater deference to considerations of individual liberties**, as weighed against the exercise of state police powers." *Id.* (emphasis added).

39.    As is most relevant here,

13

[T]he ongoing and indefinite nature of Defendants' actions weigh strongly against application of a more deferential level of review. The extraordinary emergency measures taken by Defendants in this case were promulgating beginning in March—six months ago. What were initially billed as temporary measures to "flatten the curve" and protect hospital capacity have become open-ended and ongoing restrictions aimed at a very different end—stopping the spread of an infectious disease and preventing new cases from arising—which requires ongoing and open-ended efforts. Further, while the harshest measures have been "suspended," Defendants admit that they remain in place and can be reinstated *sua sponte* as and when Defendants see fit, In other words, Pennsylvania citizens remain subject to re-imposition of the most severe provisions at any time. . . . Defendants [do] not establish any specific exit gate or end date to the emergency interventions. Rather, the record shows that Defendants view the presence of disease mitigation restrictions as a "new normal" and they have no actual plan to return to a state where all restrictions are lifted. **It bears repeating; after six months, there is no plan to return to a situation where there are no restrictions imposed upon the people of the Commonwealth**.

*Id.* at \*8 (emphasis added).

40.    The court continued,

Courts are generally willing to give **temporary** deference to **temporary** measures aimed at remedying a fleeting crisis. . . . **But, that deference cannot go on forever. It is no longer March. It is now September and the record makes clear that Defendants have no anticipated end-date to their emergency interventions**. Courts surely may be willing to give in a fleeting crisis. But here, the duration of the crisis—in which days have turned into weeks and weeks into months—already exceeds natural disasters and other episodic emergencies and its length remains uncertain. . . . **Faced with ongoing interventions of indeterminate length, "suspension" of normal constitutional levels of scrutiny may ultimately lead to the suspension of constitutional liberties themselves**.

*Id.* at \*9 (emphasis added).

41.    Indeed,

While respecting the immediate role of the political branches to address emergent situations, the judiciary cannot be overly deferential to their decisions. **To do so risks subordinating the guarantees of the Constitution**, guarantees which are the patrimony of every citizen, to the immediate need for an expedient solution. This is especially the case where, as here, measures directly impacting citizens are taken outside the normal legislative or administrative process by Defendants alone. There is no question that our founders abhorred the concept of one-person rule. The

decried government by fiat. **Absent a robust system of checks and balances, the guarantees of liberties set forth in the Constitution are just ink on parchment**. There is no question that a global pandemic poses serious challenges to governments and for all Americans **But the response to a pandemic (or any emergency) cannot be permitted to undermine our system of constitutional liberties**.

*Id.* at *10 (emphasis added).

42.     The court was not indifferent to the challenges posed by COVID-19, only jealously vigilant as to its potential to undermine constitutional freedoms. "Using normal levels of constitutional scrutiny in emergency circumstances does not prevent governments from taking extraordinary actions to face extraordinary situations." *Id.* It just requires them to understand that the Constitution does not have a pause button in times of perceived crisis. Put simply, "**[t]he application of normal scrutiny will only require the government to respect the fact that the Constitution applies even in times of emergency**." *Id.* (emphasis added).

43.     The same result should obtain here. The Governor's orders impose disparately onerous prohibitions and numerical restrictions on religious gatherings in churches and other religious ministries and assemblies. Moreover, the orders purport to dictate the manner in which Plaintiff may engage in acceptable religious activity by allowing provision and receipt of approved counseling, education, and social services, by unlimited numbers in the same AWMI buildings where religious ministries, conferences, events, and services are limited numerically. And the Governor has imposed these draconian restrictions on Plaintiff while openly celebrating and encouraging mass gatherings for protests. The Constitution demands more and so should this Court.

15

## INTRODUCTION

44.     Due to the unprecedented nature of COVID-19 and the health tragedy the disease has wrought on our great Republic and those victims suffering under its yoke, there are those who may find it "tempting to hold that First Amendment rights should acquiesce to national security in this instance." *Tobey v. Jones*, 706 F.3d 379, 393 (4th Cir. 2013). One could be forgiven for hastily reaching such a conclusion in such uncertain times, but "our Forefather Benjamin Franklin warned against such a temptation by opining that those who can give up essential liberty to obtain a little temporary safety, deserve neither liberty nor safety." *Id.*

45.     When the great American experiment was first implemented, our revered Founders took pains to note that the Constitution—and all of the rights it recognized and enshrined—was instituted "in order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defense, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity." U.S. Const. Pmbl. (emphasis added). To this very day, "we continue to strive toward '[that] more perfect union.'" *Smith v. City of New Smyrna Beach*, No. 6:110cv01110-Orl-37KRS, 2013 WL 5230659, *1 (M.D. Fla. Sept. 16, 2013). That work is not easy, and governments can and sometimes do miss the mark. This is such a case.

46.     Recognizing that times of crisis would arise, that such times might lead governments to seek to repress precious freedoms, and that the Republic's survival depended upon defeating such repressive instincts, the genius of our founding document is that it placed explicit protections into the text of the Bill of Rights. And, importantly, "[o]ur Bill of Rights placed our survival on firmer ground—that of freedom, not repression." *Konigsberg v. State Bar of California*, 366 U.S. 36, 79 (1961) (Black, J., dissenting).

47.     During times of national crisis, such as the current uncertainty arising from COVID-19, "the fog of public excitement obscures the ancient landmarks set up in our Bill of Rights." *American Communist Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 453 (1950) (Black, J., dissenting). But, where the fog of public excitement is at its apex, "the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). Without doubt, "[t]herein lies the security of the Republic, the very foundation of constitutional government." *Id.*

48.     It is beyond cavil that our commitment to our founding principles is most tested and best calculated during times of crisis and uncertainty. Indeed, "[t]imes of crisis take the truest measure of our commitment to constitutional values. **Constitutional values are only as strong as our willingness to reaffirm them when they seem most costly to bear**." *Hartness v. Bush*, 919 F.2d 170, 181 (D.C. Cir. 1990) (Edwards, J., dissenting) (emphasis added). Our willingness to reaffirm our staunch commitment to our fundamental freedoms is imperative to the very survival of the American experiment. For, "[h]istory reveals that the initial steps in the erosion of individual rights are usually excused on the basis of an 'emergency' or threat to the public. **But the ultimate strength of our constitutional guarantees lies in the unhesitating application in times of crisis and tranquility alike**." *United States v. Bell*, 464 F.2d 667, 676 (2d Cir. 1972) (Mansfield, J., concurring) (emphasis added).

49.     Plaintiff brings this case to restrain the troubling transgression of their fundamental and cherished liberties wrought by the imposition of Governor Polis's orders contrived from COVID-19. Plaintiff seeks not to discredit or discard the government's unquestionable interest in doing that task for which it was instituted—protecting the citizenry. But, as is often true in times

of crisis, Plaintiff respectfully submits that the Governor has transgressed a line the Constitution does not permit. Because of that, Plaintiff brings this action to ensure that this Court safeguards the cherished liberties for which so many have fought and died. For, "**[i]f the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be discarded**." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934) (Sutherland, J., dissenting) (emphasis added). Plaintiff prays unto the Court that it not permit the cherished and fundamental liberties enshrined in the Constitution to be another tragic casualty of COVID-19.

## PARTIES

50.     Plaintiff ANDREW WOMMACK MINITRIES, INC. ("AWMI") is a domestic nonprofit charitable corporation incorporated under the laws of the State of Colorado with its principle place of business in Woodland Park, Colorado and with affiliated ministries throughout Colorado, the nation, and the world.

51.     Defendant, JARED POLIS, in the Governor of the State of Colorado, with authority to sue and be sued and is solely responsible for issuing and reissuing his COVID-19 Executive Orders and directives at issue in this litigation. The enforcement and application of the COVID-19 orders and directives at issue in this litigation are under the direct authority and supervision of the Governor. Governor Polis is sued in his official capacity.

52.     Defendant, JILL HUNSAKER RYAN, in the Executive Director of the Colorado Department of Health and Environment, with authority to sue and be sued, and, under the authority delegated by Governor Polis, is responsible for issuing and reissuing the COVID-19 Public Health Orders at issue in this litigation. The application and enforcement of the COVID-19 Public Health

Orders at issue in this litigation and along with Governor Polis has supervision of such enforcement. Director Ryan is sued in her official capacity.

53.     Defendant, JACQUELINE REVELLO, is the Director of Teller County Department of Public Health and Environment, with authority to sue and be sued, and is responsible for issuing and reissuing County-level COVID-19 orders and directives at issue in this litigation. The application and enforcement of the Teller County COVID-19 orders and directives at issue in this litigation and along with Governor Polis has supervision of such enforcement. Director Revello is sued in her official capacity.

## JURISDICTION AND VENUE

54.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. § 1983.

55.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

56.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district, and pursuant to 28 U.S.C. § 1391(b)(3) because Defendant are subject to personal jurisdiction in this Court.

57.     This Court is authorized to grant declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant a temporary restraining order and injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

58.     This Court is authorized to grant Plaintiff's prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988.

## GENERAL ALLEGATIONS

**A.     AWMI'S RELIGIOUS MINISTRIES, SERVICES, AND EVENTS.**

59.     AWMI is a Colorado nonprofit charitable corporation and religious ministry that provides Christian and Biblically based conferences, seminars, events, and other religious gatherings in which Believers gather together to worship the Lord through the Scriptures, and received Biblical teachings, counseling, healing, and ministry.

60.     Andrew Wommack founded AWMI in order to serve and minister to people who need Jesus Christ and desire to exercise their sincerely held religious beliefs to study the Word of God to further their understanding of the Lord's teachings. Indeed, it is a core aspect of AWMI that Believers, as an act of worship, "[s]tudy to show [themselves] approved unto God, a workman that needeth not to be ashamed, rightly dividing the word of truth" *2 Timothy* 2:25 (KJV), and that AWMI aid Believers in accomplishing that mission.

61.     First and foremost, Mr. Wommack founded AWMI to minister to people, knowing that effective ministry at conventions, conferences, and gatherings must maintain **personal interaction** with those who are following and depending on AWMI's ministry. The Bible commands Christians to assemble together in-person (Hebrews 10:24-25 (not neglecting to "meet" or "assemble" together). The Bible also commands to "lay hands on" another for prayer, healing, anointing, commissioning, ordaining, conferral of authority or mission, receiving the Holy Spirit, and more. (Mark 6:5; Luke 4:40; 13:13; Acts 6:5-6; 8:14-19; 9:17; 13:3; 14:23; 1 Timothy 4:14, 5:22; 2 Timothy 1:6-7; Hebrews 6:2; James 5:14-15). The Bible is replete with commands in the Old and New Testaments to sing together in fellowship with one another. (Psalms 33:1-3; 96:1-2; 147:7; 149:1; Ephesians 5:19 [addressing one another in psalms, hymns, and spiritual songs;

20

singing and making melody in your heart to the Lord]; Colossians 3:16 [admonishing one another in palms, hymns, and spiritual songs, singing with grace in your heart]). The latter two verses use the reflexive pronoun "one another" which means the singing is to be done in an assembly of believers.

62.     One of the primary purposes of AWMI's founding was Mr. Wommack's desire to minister the Word and healing to people **directly, in-person**. His desire was to host conferences, conventions, meetings, and events to facilitate the opportunity for AWMI to speak directly with people, to talk to them about their physical and spiritual needs, and how AWMI would minister directly to those needs. That mission cannot be accomplished remotely but needs to be focused on tending to the needs of Believers and others **in person, face-to-face**. As noted below, AWMI's affiliate ministry, Charis Bible College, trains men and women for ministry and missions. In addition to study in the classroom, Charis Bible College students receive hands on, in-person training at AWMI teaching and training events held on the campus. Students are required to participate in many of the ministry and teaching sessions as part of their training and real-life experience. Without this in-person training opportunity, their education would be incomplete. The classroom work and the in-person teaching and training at AWMI conferences and worship sessions are both critically important. The value of the in-person events cannot be accomplished online. The same is true for anyone who attends an AWMI Bible teachings, healing, and praise and worship meeting.

63.     Because of that underlying purpose, AWMI hosted its first Gospel Truth Seminar in 2003 in a Marriott Hotel in Kansas City. Since that time, AWMI has hosted Gospel Truth

Seminars every year, in cities across the country, with a particular focus on Colorado where AWMI is located.

64.     Those Gospel Truth Seminars focus upon the direct needs of people who attend such conferences, and seek to spend time with such people in **direct and personal interaction**.

65.     AWMI also has an affiliated ministry, Charis Bible College, located in Woodland Park, Colorado, which is a Christian college providing in-person and online Biblical education courses. Charis Bible College currently has approximately 652 enrolled students, and typically has up to two hundred more in regular enrollment. AWMI share facilities and cooperate in the provision of ministries to Charis Bible College students and to individuals attending AWMI events, conferences, and ministries.

66.     The mission of AWMI's ministry Charis Bible College is to "equip faithful men and women for the work of the ministry by teaching spiritual truths, impartial Biblical knowledge, providing practical ministry opportunities, and grounding them in the message of God's unconditional love and grace."

67.     Students in the program at Charis Bible College are taught foundational principles in Scripture, are provided **hands-on** training in ministry with a focus on ministering and serving people **in-person**, and a specialization of various tracks. As part of the curriculum, students engage in a weekly, **in-person** meetings where students learn to teach people how to receive and minister healing to those in need.

68.     As examples of these in-person meetings for hands-on ministry training, AWMI provides students with education on prayer ministries, meeting for teaching labs on various ministry subjects, and service at various AWMI conferences.

69.     All of AWMI's and Charis Bible College's ministry and teaching activities are acts of religious worship, or facilitate the religious worship of their ministers, employees, volunteers, attendees, students, and constituents, in the exercise of their sincerely held religious beliefs.

70.     AWMI's facilities at Charis Bible College can seat 5,000 in person. The main auditorium/sanctuary at Charis Bible College can seat 3,100 individuals, and the remaining classrooms and event spaced can host 1,900 individuals.



71.     AWMI's capacity for hosting religious conferences, meetings, and events is large, and its campus is capable of far exceeding the arbitrary numerical limitations disparately imposed on AWMI.

72.     A cursory review of its facilities reveals that the draconian limitation of 175 people at one conference is neither rational, legitimate, nor compelling.



73.     Charis Bible College's campus includes a large auditorium and classrooms throughout the campus, as demonstrated in the map of AWMI's facilities at Charis Bible College.



74. In addition to the large auditorium at the shared facilities of AWMI and Charis Bible College, it also has other rooms and meeting spaces on its property in Woodland Park that can host individuals for religious conferences, meetings, events, activities and gatherings. A true and correct copy of the map outlining the various facilities at AWMI properties in attached hereto as **EXHIBIT A** and incorporated herein.

**B.      THE GOVERNOR'S EXECUTIVE ORDERS AND PUBLIC HEALTH ORDERS AND DISCRIMINATORY TREATMENT BETWEEN RELIGIOUS GATHERINGS AND NONRELIGIOUS GATHERINGS.**

75. On March 11, 2020, the Governor issued Executive Order D 2020 003 in which he declared a state of emergency in Colorado due to the presence of the novel corona virus, COVID-19. A true and correct copy of Executive Order D 2020 003 is attached hereto as **EXHIBIT B** and incorporated herein.

76. Executive Order D 2020 003 authorized the Colorado Department of Health and Environment to issue all public health orders necessary to protects individuals in Colorado.

77. On March 16, 2020, the Colorado Department of Health and Environment ("CDPHE") issues Public Health Order ("PHO") 20-22 requiring all bars, restaurants, theaters, gymnasiums, and casinos to close throughout Colorado. A true and correct copy of PHO 20-22 is attached hereto as **EXHIBIT C** and incorporated herein.

78. On March 22, 2020, pursuant to the Governor's order, CDPHE issued PHO 20-24 requiring a 50 percent reduction in "nonessential business in-person work and extreme social distancing." A true and correct copy of PHO 20-24 is attached hereto as **EXHIBIT D** and incorporated herein

79.     PHO 20-24 ordered all "nonessential" businesses to reduce their work force at their facilities to 50 percent of employees, but exempted what it labeled "Critical Businesses."

80.     The list of "Critical Businesses" exempted from PHO 20-24's restrictions included **12 categories** of exempt sectors, including "Healthcare Operations," "Critical Infrastructure," "Critical Manufacturing," "Critical Retail," "Critical Services," "News Media," "Financial Institutions," "Providers of Basic Necessities to Economically Disadvantaged Populations," "Construction," "Defense," "Critical Services Necessary to Maintain the Safety, Sanitation, and Critical Operations of Residences and Other Critical Businesses," and "Vendors that Provide Critical Services or Products."

81.     The 12 categories was comprised **82 specific activities and services that were exempt**, including *inter alia* grocery stores; "big box" hardware, farm supply, and construction retail stores (Home Depot, Lowes, etc.); "big box" retail stores that supply home products (WalMart, Target, etc.); marijuana dispensaries, liquor stores, accounting firms, laundromats, funeral homes, and warehouse distribution facilities.

82.     Religious worship services, ministries, programs, conferences, events, and gatherings were not exempt, and thus subject to the same limitations as other so-called "Non-Critical" businesses with the only exception being "[i]n-person pastoral services for individuals who are in crisis or in need of end of life services provided social distancing is observed to the greatest extent possible."

83.     The only requirement imposed upon "Critical Businesses" was that "[t]o the greatest extent possible" they encourage social distancing among employees and customers.

84.     On March 25, 2020, the Governor issued Executive Order D 2020 017, the "Safer at Home" Order, which required "all Coloradoans to stay at home, subject to the limited exceptions of obtaining food and other household necessities, going to and from work at critical businesses, seeking medical care, caring for dependents or pets, or caring for a vulnerable person in another location." A true and correct copy of Executive Order D 2020 017 is attached hereto as **EXHIBIT E** and incorporated herein.

85.     As a result of Executive Order 2020 017, the Governor **effectively prohibited all religious gatherings and worship services because individuals could not even leave their homes to attend a religious worship service**. Because religious worship services, events, ministries, or activities were not included in the exempt categories, Coloradoans could not leave their homes too attend such services without violating the Governor's Orders.

86.     On March 27, 2020, CDPHE issued Second Updated PHO 20-24 implementing the Stay at Home requirements of Executive Order D 2020 017. A true and correct copy of Second Updated PHO 20-24 is attached hereto as **EXHIBIT F** and incorporated herein.

87.     The Second Updated PHO 20-24 expressly prohibited any gatherings outside of the home, including religious gatherings, of any number of people. It noted: "All public and private gatherings of any number of people occurring outside a **Residence** are prohibited." EXHIBIT F at 3, §I,B (emphasis original).

88.     Though explicitly imposing an outright ban of all gatherings, Second Amended PHO 20-24 stated that "Houses of worship may remain open," but said "these institutions are encouraged to implement electronic platforms to conduct services whenever possible or to conduct smaller (10 or fewer congregants)" and ensure strict social distancing. EXHIBIT F at 8, §III.C.5.

28

89.     On April 1, 2020, CDPHE issued Third Updated PHO 20-24, which kept the relevant portions of the challenged restrictions in place. A true and correct copy of Third Updated PHO 20-24 is attached hereto as **EXHIBIT G** and incorporated herein.

90.     On April 6, 2020, the Governor issued Executive Order D 2020 024, amending and extending the stay-at-home order, but otherwise continuing the regime established in Executive Order 2020 017 and PHO 20-24. A true and correct copy of Executive Order 2020 024 is attached hereto as **EXHIBIT H** and incorporated herein.

91.     On April 8, 2020, the Governor issued Executive Order D 2020 032 which extended the State of Emergency declaration in Colorado due to COVID-19. A true and correct copy of Executive Order D 2020 032 is attached hereto as **EXHIBIT I** and incorporated herein.

92.     On April 22, 2020, CDPHE issued PHO 20-26 requiring all workers at Critical Businesses to wear a face covering and suggesting that employees at certain businesses to wear gloves. A true and correct copy of PHO 20-26 is attached hereto as **EXHIBIT J** and incorporated herein.

93.     On Aril 26, 2020, the Governor issued Executive Order D 2020 044, the "Safer at Home" Order. A true and correct copy of Executive Order D 2020 044 is attached hereto as **EXHIBIT K** and incorporated herein.

94.     The Safer at Home Order directed the CDPHE to issue a new PHO that would "[p]rohibit public gatherings of more than ten (10) persons or more in both public spaces and private commercial venues." EXHIBIT K at 3, §II.H.

95.     On April 26, 2020, pursuant to the Governor's Safer at Home Order, CDPHE issued PHO 20-28 to effectuate the Safer at Home Order. A true and correct copy of PHO 20-28 is attached hereto as **EXHIBIT L** and incorporated herein.

96.     PHO 20-28 stated: "All public and private gatherings of any number of people occurring outside a residence are limited to no more than (10) individuals, except as permitted in this [PHO]." EXHIBIT L at 3, §I.C.

97.     PHO 20-28 continued the exception from the gathering prohibition for organizations that provide "food, shelter, social services, and other necessities of life." EXHIBIT L at 27, APPENDIX F.

98.     PHO 20-28 also continued the 12 exempt categories was **82 specific activities and services that were exempt**, including *inter alia* grocery stores; "big box" hardware, farm supply, and construction retail stores (Home Depot, Lowes, etc.); "big box" retail stores that supply home products (WalMart, Target, etc.); **marijuana dispensaries**, liquor stores, accounting firms, laundromats, funeral homes, and warehouse distribution facilities.

99.     Though explicitly imposing an outright ban of all gatherings, PHO 20-28 stated that "Houses of worship may remain open," but said "these institutions are encouraged to implement electronic platforms to conduct services whenever possible or to conduct smaller (10 or fewer congregants)" and ensure strict social distancing. EXHIBIT L at 29, APPENDIX F.

100.     On May 4, 2020, CDPHE issued Amended PHO 20-28. A true and correct copy of Amended PHO 20-28 is attached hereto as **EXHIBIT M** and incorporated herein.

101.     For purposes relevant to the challenged provisions, Amended PHO 20-28 kept the original PHO 20-28 regime in place.

102.     On May 7, 2020, the Governor issued Executive Order D 2020 058, which extended Colorado's declared state of emergency and continued to authorize CDPHE to issue public health orders and directives restricting the activities of individuals in Colorado. A true and correct copy of Executive Order D 2020 058 is attached hereto as **EXHIBIT N** and incorporated herein.

103.     On May 8, 2020, CDPHE issued the Second Amended PHO 20-28, which for relevant purposes, kept the original regime of PHO 20-28 in place. A true and correct copy of Second Amended PHO 20-28 is attached hereto as **EXHIBIT O** and incorporated herein

104.     On May 14, 2020, CDPHE issued the Third Amended PHO 20-28, which for relevant purposes, kept the original regime of PHO 20-28 in place. A true and correct copy of Third Amended PHO 20-28 is attached hereto as **EXHIBIT P** and incorporated herein.

105.     On May 22, 2020, the Governor issued Executive Order D 2020 076, once again, extending the declared state of emergency in Colorado due to COVID-19. A true and correct copy of Executive Order D 2020 076 is attached hereto as **EXHIBIT Q** and incorporated herein.

106.     On May 25, 2020, the Governor issued Executive Order D 2020 079, Amending and Extending Executive Order D 2020 044 "Safer at Home." A true and correct copy of Executive Order D 2020 076 is attached hereto as **EXHIBIT R** and incorporated herein.

107.     Executive Order D 2020 079 extended the requirements of the Safer at Home Order and required all Coloradoans to continue to abide by the regimes articulated all previous CDPHE PHOs.

108.     On May 26, 2020, in accordance with the Governor's directives in Executive Order D 2020 079, CDPHE issued Fourth Amended PHO 20-28 further implementing the restrictions on

the activities of Coloradoans. A true and correct copy of the Fourth Amended PHO 20-28 is attached hereto as **EXHIBIT S** and incorporated herein.

109.    Fourth Amended PHO 20-28 permitted restaurants to reopen for in-person service provided that occupancy was capped at 50% or no greater than 50 people, whichever is less. EXHIBIT S at 6, §II.C.1.

110.    Office environments in "Non-Critical" businesses were permitted to operate in-person employment provided it capped in-person employees at 50%. EXHIIBT S at 6, §II.H.1.

111.    Houses of worship were permitted to remain open provided they encouraged online worship services or limited in-person worship services to 10 or fewer congregants per service and practiced social distancing. EXHIBIT S at 30.

112.    The Fourth Amended PHO 20-28 otherwise kept the relevant provisions from the previous versions intact.

113.    On June 1, 2020, the Governor issued Executive Order D 2020 091 expanding, amending, and supplementing the Safer at Home Order. A true and correct copy of Executive Order D 2020 091 is attached hereto as **EXHIBIT T** and incorporated herein.

114.    On June 2, 2020, CDPHE issued the Fifth Amended PHO 20-28. A true and correct copy of Fifth Amended PHO 20-28 is attached hereto as **EXHIBIT U** and incorporated herein.

115.    Fifth Amended PHO 20-28 continued to prohibit public and private gatherings of more than 10 individuals, except as otherwise provided in the PHO. EXHIBIT U at 3, §II.C.

116.    For the first time in the litany of Executive Orders and PHOs, Fifth Amended PHO 20-28 explicitly provided a special section for restrictions on Houses of Worship. EXHIBIT U at 11, §II.M.

117.    Fifth Amended PHO 20-28 provided that, starting June 4, 2020, "houses of worship may open to 50% of the posted occupancy limit indoors not to exceed 50 people, whichever is less," and were required to impose strict social distancing. EXHIBIT U at 11, §II.M.

118.    If a church or religious ministry used additional rooms in facility, the gathering could be no larger than 10 people and require social distancing. *Id.*

119.    Additionally, Houses of Worship, religious ministry, or church were required to mandate that all staff, volunteers, and congregants wear face masks while on the premises and to engage in extensive sanitization. *Id.*

120.    Fifth Amended PHO 20-28 otherwise kept the previous regime in place in the relevant provisions.

121.    On June 5, 2020, CDPHE issued the Sixth Amended PHO 20-28. A true and correct copy of the Sixth Amended PHO 20-28 is attached hereto as **EXHIBIT V** and incorporated herein.

122.    Sixth Amended PHO 20-28 authorized "Life rite, such as wedding ceremonies, graduation ceremonies, and other religious rites" to operate provided occupancy was capped at 50% or no greater than 50 people with strict social distancing. EXHIBIT V at 6, §I.K.

123.    Sixth Amended PHO 20-28 again stated that Houses of Worship, religious gatherings, and religious ministries may resume in-person religious gatherings provided occupancy was limited to 50% of capacity not to exceed 50 people per room. *Id.* at 11, §II.M.

124.    Critical and Non-Critical Retail business continued to be permitted to operate provided only that their occupancy was capped at whatever number would permit 6-foot social distancing to be maintained, but otherwise placed no numerical limit on the number of employees, customers, and others gathered in the facility. *Id.* at 20.

125.    Non-Critical Office-Based Business continued to be permitted to operate provided only that it limited its staff to 50% of the in-office occupancy and engaged in social distancing and other hygiene protocols. Otherwise, however, there was no numerical limit on the number of individuals who could gather in the office setting. *Id.* at 24.

126.    Critical Businesses were permitted "to continue to operate as normal," with no numerical restrictions whatsoever. *Id.* at 30.

127.    On June 18, 2020, CDPHE issued the Seventh Amended PHO 20-28. A true and correct copy of the Seventh Amended PHO 20-28 is attached hereto as **EXHIBIT W** and incorporated herein.

128.    As with all previous PHOs, the Seventh Amended PHO 20-28 continued to prohibit all public and private gatherings of greater than 10 people, unless otherwise exempted by the PHO. EXHIBIT W at 3, §I.C.

129.    The Seventh Amended PHO 20-28 stated that, beginning June 18, 2020, "indoor and outdoor events such as receptions, events, non-critical auctions, theatres, trade shows, markets, indoor malls, rodeos, fairs, festivals and parades and other indoor or outdoor events not otherwise covered by this Order may operate," provided that outdoor events were restricted to 175 people and indoor venues were limited to 100 people. *Id.* at 5-6, §I.H.4.

130.    Critical Businesses continued to be permitted to operate as normal with no numerical restriction. *Id.* at 8, §II.B.

131.    Non-Critical Office-Based Businesses were permitted to continue operating provided only that it limit its staff and employees to no more than 50% of the occupancy, but otherwise imposed no numerical limit. *Id.* at 9, §II.H.

132.    Seventh Amended PHO 20-28 continued to permit religious gatherings, Houses of Worship, and religious meetings provided that they limit the number of individuals gathered to 50% occupancy or 50 people, whichever is less per room. *Id.* at 12, §II.M. The explicit numerical restriction imposed on religious gatherings was not imposed on other similarly situated non-religious gatherings.

133.    For the first time, Seventh Amended PHO 20-28 stated that "extra large houses of worship may operate up to 100 people indoors" if they could properly social distance. *Id.* The 100-person limit was imposed on religious gatherings and houses of worship regardless of whether the facility could accommodate many more individuals while still complying with social distancing.

134.    For outdoor worship, religious gatherings were required to maintain 6-foot social distancing and seeking government approval for the number of individuals it wished to host outdoors, a restriction not imposed on any other outdoor gathering. *Id.*

135.    On June 20, 2020, the Governor issued Executive Order D 2020 109, yet again extending the declared state of emergency in Colorado. A true and correct copy of Executive Order D 2020 109 is attached hereto as **EXHIBIT X** and incorporated herein.

136.    On June 30, 2020, in accordance with the Governor's Executive Order D 2020 123, CDPHE issued 8th Amended PHO 20-28, which largely kept the relevant provisions intact. A true and correct copy of 8th Amended PHO 20-28 is attached hereto as **EXHIBIT Y** and incorporated herein.

137.    On July 6, 2020, the Governor issued Executive Order D 2020 125, further extending (yet again) the declared state of emergency in Colorado and continuing to authorize executive powers for him and his cabinet to continue restricting the lives, liberties, and activities

in the state of Colorado. A true and correct copy of Executive Order D 2020 125 is attached hereto as **EXHIBIT Z** and incorporated herein.

138.    Executive Order D 2020 125 **was the 10th time the Governor had maintained a declared state of emergency and authorized "emergency" "temporary" powers to govern the lives of Coloradoans**.

139.    On July 9, 2020, the Governor issued Executive Order D 2020 127, the "Protect Our Neighbors Order," directing CDPHE to create a certification process for counties or regions to move from the Safer at Home and Outdoors restriction scheme to the Protect Our Neighbors restriction scheme "to allow all activities to occur at fifty perfect (50%) capacity with Social Distancing with no more than five hundred (500) people in any one setting," and to issue a new PHO implementing the Protect Our Neighbors scheme. A true and correct copy of Executive Order D 2020 127 is attached hereto as **EXHIBIT AA** and incorporated herein

140.    As part of the directive in Executive Order D 2020 127, On July 10, 2020, CDPHE issued PHO 20-32, the Protect Our Neighbors Order, which imposed further restrictions on gatherings in Colorado and amended various restrictions previously imposed. A true and correct copy of PHO 20-32 is attached hereto as **EXHIBIT BB** and incorporated herein.

141.    Under PHO 20-32, Critical Businesses are permitted to continue operating as normal without any numerical restriction whatsoever. EXHIBIT BB at 3, §II.B.1.

142.    Non-Critical Office-Based Businesses are permitted to "operate at 50% capacity **without a total person cap within the workspace**." *Id.* at 4, §II.B.4 (emphasis added).

143.    PHO 20-32 authorized various counties in Colorado to be approved for a variance to the numerical restrictions imposed in the regime instituted through PHO 20-28 (and all its various amendments and revisions). *Id.* at 6, §II.E.

144.    Under the variance program for Protect Our Neighbors, certain counties that receive approval may permit "any business or activity within their jurisdiction to operate at 50% of their pre-pandemic capacity not to exceed 500 people in one setting." *Id.* However, Critical Businesses and Non-Critical Office-Based Businesses were granted special exemptions from the limits imposed in counties with variances.

145.    Critical Businesses "may continue to operate without capacity limitations." *Id.*, §II.E.1.

146.    Non-Critical Office-Based Businesses "may operate at 50% of their pre-pandemic capacity without capacity limitations." *Id.*

147.    Thus, though certain similarly situated non-religious gatherings were permitted to operate without numerical limitation, under PHO 20-32 religious gatherings, activities, and services are not granted the same exemption and still restricted to 100 people.

148.    On July 21, 2020, the Governor issued Executive Order D 2020 142, further amending and extending his previous Stay at Home Orders. A true and correct copy of Executive Order D 2020 142 is attached hereto as **EXHIBIT CC** and incorporated herein.

149.    On July 23, 2020, the Governor issued Executive Order D 2020 144, further amending and extending his previous Safer at Home. A true and correct copy of Executive Order D 2020 144 is attached hereto as **EXHIBIT DD** and incorporated herein.

150.    On July 30, 2020, CDPHE issued Ninth Amended PHO 20-28 further modifying the various restrictions on gatherings. A true and correct copy of Ninth Amended PHO 20-28 is attached hereto as **EXHIBIT EE** and incorporated herein.

151.    The Ninth Amended PHO 20-28, subject to applicable distancing requirements, continued the exemption from capacity and numerical limits for employees, customers, and visitors of nearly all other Critical Businesses, including Critical Retail businesses; continued the 50% capacity limits (with no numerical cap) for Non-Critical Retail and Non-Critical Office-Based businesses; and continued permission for conducting programs and courses through in-person instruction at postsecondary institutions at 50% capacity not to exceed 50 people per room, or up to 100 people per extra large room. EXHIBIT DD at 8–11, § II.B, G, H, 19, § IV, 22–24 (App'x A), 27–28 (App'x C), 34–39 (App'x F).

152.    On August 4, 2020, the Governor issued Executive Order D 2020 152, further extending the declared state of emergency for Colorado. A true and correct copy of Executive Order D 2020 152 is attached hereto as **EXHIBIT FF** and incorporated herein.

153.    Executive Order D 2020 152 **was the 11th time the Governor had maintained a declared state of emergency and authorized "emergency" "temporary" powers to govern the lives of Coloradoans**.

154.    On August 7, 2020, in accordance with the Governor's Executive Order D 2020 154 issued the same day, CDPHE issued Amended PHO 20-32, amending and extending the requirements of PHO 20-32. A true and correct copy of Amended PHO 20-32 is attached hereto as **EXHIBIT GG** and incorporated herein.

155.    The Amended PHO 20-32 continued the certification process for counties or regions to move from the Safer at Home and Outdoors restriction scheme to the Protect Our Neighbors restriction scheme, and left in place the Safer at Home and Outdoors restriction scheme under PHO 20-28 (as amended) for all counties that have not been certified to move.

156.    On August 21, 2020, CDPHE issued the Tenth Amended PHO 20-28. A true and correct copy of Tenth Amended PHO 20-28 is attached hereto as **EXHIBIT HH** and incorporated herein.

157.    The Tenth Amended PHO 20-28 of worship differently from almost all other Critical Businesses by imposing numerical caps: the PHO limited houses of worship indoor operations to 50% capacity, not to exceed 50 people, per room, or up to 100 people indoors in "extra large" houses of worship," and limited outdoor worship services to the maximum amount approved by local government authorities. EXHIBIT HH at 14, § II.M.

158.    The Tenth Amended PHO 20-28, subject to applicable distancing requirements, continued the exemption from capacity and numerical limits for employees, customers, and visitors of nearly all other Critical Businesses, including Critical Retail businesses; continued the 50% capacity limits (with no numerical cap) for Non-Critical Retail and Non-Critical Office-Based businesses; and continued permission for conducting programs and courses through in-person instruction at postsecondary institutions at 50% capacity not to exceed 50 people per room, or up to 100 people per extra large room. EXHIBIT HH at 8, 11, § II.B, G, H, 20, § IV, 22–24 (App'x A), 27–28 (App'x C), 34–39 (App'x F).

159.    On August 21, 2020, the Governor issued Executive Order D 2020 170, which further amended and extended the Safer at Home Order. A true and correct copy of Executive Order D 2020 170 is attached hereto as **EXHIBIT II** and incorporated herein.

160.    On September 2, 2020, the Governor issued Executive Order D 2020 176, further extending the declared state of emergency for Colorado. A true and correct copy of Executive Order D 2020 176 is attached hereto as **EXHIBIT JJ** and incorporated herein.

161.    Executive Order D 2020 152 **was the 12th time the Governor had maintained a declared state of emergency and authorized "emergency" "temporary" powers to govern the lives of Coloradoans**.

162.    On September 5, 2020, in accordance with the Governor's Executive Order D 2020 178 issued the same day, CDPHE issued Second Amended PHO 20-32, further extending and amending the Protect Our Neighbors Order. A true and correct copy of Second Amended PHO 20-32 is attached hereto as **EXHIBIT KK** and incorporated herein.

163.    The Second Amended PHO 20-32 continued the certification process for counties or regions to move from the Safer at Home and Outdoors restriction scheme to the Protect Our Neighbors restriction scheme, and left in place the Safer at Home and Outdoors restriction scheme under PHO 20-28 (as amended) for all counties that have not been certified to move.

164.    On September 15, 2020, CDPHE issued PHO 20-35, the "Safer at Home Dial Order," which supersedes PHO 20-28, as amended, and further implements the Governor's directives in the Safer at Home and Outdoors Order by creating a tiered system of operating and activity restrictions at the county level. A true and correct copy of PHO 20-35 is attached hereto as **EXHIBIT LL** and incorporated herein.

165.   In Level 1 of the Stay at Home Dial, the following pertinent restrictions apply:

(a)   Houses of worship, still listed as Critical Businesses, may operate indoors at 50% of building capacity but not to exceed 175 people per room;

(b)   Other Critical Businesses may operate as normal with no capacity or numerical limitation;

(c)   Office-Based Businesses may operate indoors with 50% of employees and no numerical cap; and

(d)   Non-Critical Retail may operate indoors at 50% building capacity and no numerical cap.

EXHIBIT LL at 4–5, § II.B, 15, § III.R, 24–28 (App'x A).

166.   In Level 2 of the Stay at Home Dial, the following pertinent restriction apply:

(a)   Houses of worship, still listed as Critical Businesses, may operate indoors at 50% of building capacity but not to exceed 50 people per room, or 100 people per room if the establishment is extra large;

(b)   Other Critical Businesses may operate as normal with no capacity or numerical limitation (same as Level 1);

(c)   Office-Based Businesses may operate indoors with 50% of employees and no numerical cap (same as Level 1); and

(d)   Non-Critical Retail may operate indoors at 50% building capacity and no numerical cap (same as Level 1EXHIBIT LL, at 6, §II.C.

EXHIBIT LL at 6–7, § II.C, 15, § III.R, 24–28 (App'x A)

167.   In Level 3 of the Stay at Home Dial, the following restrictions apply:

41

      (a)     Houses of worship, still listed as Critical Businesses, may operate indoors at 25% of building capacity but not to exceed 50 people per room;

      (b)     Other Critical Businesses may operate as normal with no capacity or numerical limitation (same as Level 1);

      (c)     Office-Based Businesses may operate indoors with 25% of employees and no numerical cap; and

      (d)     Non-Critical Retail may operate indoors at 25% building capacity and no numerical cap.

EXHIBIT LL at 7-8, § II.D, 15, § III.R, 24–28 (App'x A).

168.    Teller County, where AWMI and its facilities are located is currently in Level 1 of the Safer at Home Dial. *See* DCPHE COVID-19 Dial Dashboard, *available at* https://covid19.colorado.gov/data/covid-19-dial/covid-19-dial-dashboard (last visited September 25, 2020).

169.    At each Level of the Safer at Home Dial under PHO 20-35 (*i.e.*, **in every county throughout the state**), houses of worship are subjected to stricter capacity and numerical limitations for gatherings, even with distancing requirements observed, as compared to comparable non-religious activities involving gathering or assembling of large numbers of people.

170.    AWMI hereinafter refers to all of the Governor's COVID-19 Executive Orders discussed herein and all of the COVID-19 Public Health Orders discussed herein, collectively, as the "Governor's Orders."

171.    **Given the constantly changing and seemingly never ending issuance of amended, extended, supplemental, and new Executive Orders and Public Health Orders,**

**AWMI also hereby expressly notes that its collective reference to "the Governor's Orders" is intended to and does refer to all such orders and directives and to all future amendments, extensions, modifications, and supplements to such orders and also to future iterations of such orders issued in new Executive Orders or Public Health Orders**.

C. **THE GOVERNOR'S ORDERS INTERNALLY DISCRIMINATE BETWEEN AWMI'S *IMPERMISSIBLE* RELIGIOUS ACTIVITIES AND *PERMISSIBLE* NONRELIGIOUS GATHERINGS IN THE SAME FACILITY.**

 1. **The Governor's Orders Internally Discriminate Between AWMI's Worship-Based Religious Ministries, Activities, Events, Conferences, And Services, And AWMI's Nonreligious Activities In The Same Facility.**

172. PHO 20-24 was the first order to use the designation "Critical Businesses" to establish the non-religious operations and activities that AWMI could engage in without numerical restrictions, including the provision of "food, shelter, social services, and other necessities of life for economically disadvantaged, persons with access and functional needs, or otherwise needy individuals." EXHIBIT D § II.2.

173. The Second Amended PHO 20-24 continued the exemption for non-religious activities including for "organizations that provide food, shelter, social services, and other necessities of life for economically disadvantaged, persons with access and functional needs, or otherwise needy individuals." EXHIBIT F, §III.C.2.

174. PHO 20-28 continued the exemption from gathering, travel, and numerical restrictions for the non-religious activities of providing "food, shelter, social services, and other necessities of life." EXHIBIT L at 27 (App'x F).

43

175.     The PHO exemptions from gathering, travel, and numerical restrictions for the non-religious activities of providing "food, shelter, social services, and other necessities of life" have existed in every iteration of the Governor's Orders since PHO 20-24 and remain in effect under the current scheme in PHO 20-35.

176.     AWMI provides financial support for many local ministries in Colorado, including Life Network and Choices crisis pregnancy centers, Gospel Home for Women, Springs Rescue Mission, and Crossroads Ministries, which all provide food, clothing, social services, and other necessities of life. Volunteers from AWMI's ministries and Charis Bible College students often dedicate their time to volunteer to provide help for these organizations

177.     Under the Governor's Orders, volunteers associated with AWMI and Charis Bible College students may volunteer to provide counseling, social services, and other necessities of life for needy individuals at Life Network & Choices crisis pregnancy centers, in which volunteers provide women facing unplanned pregnancies with free counseling for employment, education, and practical needs, provides resources for medical needs, and provides food, clothing, and other necessities of life. And, under the Governor's Orders, AWMI could Charis Bible College students and other volunteers to use AWMI's facilities to provide such social services to an unlimited number of constituents of Life Network and Choices crisis pregnancy centers, provided only that every in attendance engages in social distancing.

178.     Under the Governor's Orders, AWMI's volunteers may provide nonreligious counseling, social services, and other necessities of life for women constituents of Life Network's Colorado Springs Pregnancy Center and Choices Pregnancy Center may be administered in unlimited numbers, provided only that social distancing is satisfied.

179.    But, if volunteers associated with AWMI and Charis Bible College students transition from providing these women with counseling, social services, food, clothing, and other necessities of life to providing them spiritual counseling, spiritual food in the form of communion, or otherwise transitions to a religious worship service with the same women in the same room, the Governor's Orders would automatically subject them to criminal penalties for hosting an impermissible worship service if there is more than 175 women in the room.

180.    Under the Governor's Orders, volunteers associated with AWMI and Charis Bible College students may volunteer to provide counseling, social services, and other necessities of life for needy individuals at Gospel Home for Women, in which counseling, social services, and drug rehabilitation services to those individuals struggling with substance abuse and drug addictions. And, under the Governor's Orders, AWMI could Charis Bible College students and other volunteers to use AWMI's facilities to provide such social services to an unlimited number of constituents of Gospel Home for Women, provided only that every in attendance engages in social distancing.

181.    But, if volunteers associated with AWMI and Charis Bible College students transition from providing these women with addiction counseling, social services, food, clothing, and other necessities of life to providing them spiritual counseling, spiritual food in the form of communion, or otherwise transitions to a religious worship service with the same women in the same room, the Governor's Orders automatically subject them to criminal penalties for hosting an impermissible worship service if there is more than 175 women in the room.

182.    Under the Governor's Orders, volunteers associated with AWMI and Charis Bible College students may provide counseling, social services, and other necessities of life for needy

individuals at Springs Rescue Mission, which provides shelter, clothing, counseling, and social services for homeless and needy individuals.

183.     Under the Governor's Orders, volunteers associated with AWMI and Charis Bible College students may provide nonreligious counseling, social services, shelter, clothing, food, and other necessities of life for needy individuals at Springs Rescue Mission program in unlimited numbers provided only that social distancing is practiced.

184.     But, if volunteers associated with AWMI and Charis Bible College students transition from providing the Springs Rescue Mission clients with counseling, social services, food, clothing, shelter, and other necessities of life to providing them spiritual counseling, spiritual food in the form of communion, or otherwise transitions to a religious worship service with the same individuals in the same room, the Governor's Orders automatically subject them to criminal penalties for hosting an impermissible worship service if there is more than 175 individuals in the room

185.     Under the Governor's Orders, volunteers associated with AWMI and Charis Bible College students provide counseling, social services, and other necessities of life for needy individuals in Crossroads Ministries, which provides social services, counseling, and assistance to elderly individuals in the community.

186.     Under the Governor's Orders, volunteers associated with AWMI and Charis Bible College students may provide its nonreligious counseling, social services, and other necessities of life for elderly individuals in need of care for needy individuals in Crossroads Ministries' program in unlimited numbers provided only that social distancing is practiced.

187.     But, if volunteers associated with AWMI and Charis Bible College students transition from providing these women with counseling, social services, food, clothing, shelter, and other necessities of life to providing them spiritual counseling, spiritual food in the form of communion, or otherwise transitions to a religious worship service with the same individuals in the same room, the Governor's Orders automatically subject them to criminal penalties for hosting an impermissible worship service if there is more than 175 individuals in the room.

188.     The Governor's Orders' discriminatory treatment between AWMI's worship-based religious ministries, activities, events, conferences, and services, and AWMI's provision of non-religious counseling, social services, and other necessities of life to the same people in the same building lacks a rational, legitimate, or compelling justification and imposes irreparable harm on AWMI.

> **2.    The Governor's Orders Discriminate Between AWMI's Worship-Based Religious Ministries, Activities, Events, Conferences, and Services, and AWMI's Permissible Religious Activities Within Its Charis Bible College Educational Programs in the Same Facilities.**

189.     PHO 20-28 provided that Postsecondary Institutions may conduct in-person education programs, subject to informing the Colorado Department of Higher Education and following social distancing requirements. EXHIBIT L at 13, § IV.

190.     The Governor's Orders subsequently imposed occupancy and numerical restrictions on in-person instruction at Postsecondary Institutions.

191.     Under PHO 20-35, the Stay at Home Dial, AWMI's educational ministries at Charis Bible College are Critical Businesses that are permitted to operate according to specific "seated event" requirements. EXHIBIT LL at 14–16, § III.M, R, 28 (App'x A), 45 (App'x I). The

seated event requirements limit attendance only by 6-foot physical distancing. EXHIBIT LL at 45 (App'x I), § I.A.1.

192.    As part of its ministries, AWMI employees operate Charis Bible College with an enrollment of 652 students, who gather together in various shared facilities for religious educational programs, services, convocations, events, and other activities.

193.    Under the Governor's Orders' seated event requirements, Charis Bible College students may gather in any of the shared facilities for in-person religious education without numerical limitation provided they engage in social distancing and other applicable sanitization requirements.

194.    Thus, in AWMI's shared 3,100 seat auditorium used by AWMI and Charis Bible College, AWMI employees may provide a one-hour educational program for all 652 Charis Bible College students without violating any the Governor's Orders' seated event requirements provided social distancing requirements are met.

195.    But if the same 652 students remain in that same room for an additional hour after the Charis Bible College educational program, and AWMI conducts a religious worship service for them, the event would violate the 175-person restriction for worship services under the Governor's Orders.

196.    There is no distinction between the one-hour education program for 652 students and the one-hour religious worship services for the same 652 students, but the Governor's Orders exempt one as educational and prohibit the other as religious.

197.    The same is true for even smaller numbers. If, in the same 3,100 seat auditorium, AWMI employees provide a one-hour Charis Bible College educational program for 176, socially-

distanced Charis Bible College students, and in the next hour conduct a religious worship service for the same 176 students, the educational program would be permitted but the religious worship service prohibited.

198.    There is no compelling, legitimate, or even rational basis to differentiate the restrictions applicable to the one-hour education program for 652 socially-distanced students as compared to the one-hour religious worship service for the same 652 students, but the Governor's Orders permit one as educational and prohibit the other as religious.

199.    Additionally, under PHO 20-25, P-12 education for public and private schools may provide in-person learning with any numerical limitation. EXHIBIT LL at 29, Appendix A. Thus, if AWMI hosted an educational program for high school and middle school students, it could do so with an unlimited number of students.

200.    But, if AWMI then offers a religious worship service to the same P-12 students students in the same 3,100 seat auditorium for the hour following the educational program, it is a prohibited worship service and subject to criminal penalty for the "crime" of having too many people in the worship service if there are more than 175 students in the auditorium.

201.    There is no rational, legitimate, or compelling reason to differentiate between two programs that are virtually identical merely because one is considered educational and the other religious.

**D.    THE GOVERNOR'S ORDERS EXTERNALLY DISCRIMINATE BETEWEEN AWMI'S PROHIBITED RELIGIOUS ACTIVITIES AND THE PERMITTED COMPARABLE NON-RELIGIOUS ACTIVITIES.**

202.    Not only do the Governor's Orders internally discriminate between the impermissible religious activities and permissible non-religious activities of AWMI in its own

facilities, but they also externally discriminate between AWMI's prohibited religious activities and permitted comparable non-religious activities.

203.    From the original PHO 20-28 to the current PHO 20-35 Safer at Home Dial, the Governor's Orders **expanded to 13 categories and nearly 100 specific subcategories the "Critical Business" operations and activities exempt from the numerical and stay-at-home restrictions of the Governor's Orders**, including, *inter alia*, grocery stores; 'big box' hardware, farm supply, and construction retail stores (e.g., Home Depot, Lowes, etc.); 'big box' retail stores that supply home products (e.g., Walmart, Target, etc.); marijuana dispensaries, liquor stores, accounting firms, laundromats, funeral homes, and warehouse distribution facilities.

204.    Under the PHO 20-35 Safer at Home Dial, Critical Businesses exempt from numeric and stay-at-home restrictions include P-12 public and private schools for purposes of in-person learning as determined by the schools or school districts, and postsecondary institutions under the seated events requirements.

205.    These exempt activities and operations allow large numbers of people to work, shop, sit, move about, converse, touch surfaces, pick up and replace products, breath air, and exchange payments, in the same indoor spaces, without time or numerical limitations. Employees of such Critical Businesses are allowed to work indoors, 8 or more hours per day, in multiple shifts per day, up to 7 days per week, without numerical limitations.

206.    Also from the original PHO 20-28 to the current PHO 20-35 Safer at Home Dial in Levels 1 and 2, Non-Critical Retail (e.g., "clothing, home goods, cell phone stores, mattresses, appliances, thrift shops, apothecaries, vape and tobacco shops, craft, hobby and fabric stores, fishing tackle retailers, sporting goods, boutiques, etc.") and Non-Critical Office-Based Businesses

are permitted to open at 50% capacity without any numerical cap or time restrictions for customers or employees.

207.    From the original PHO 20-28 to the current PHO 20-35 Safer at Home Dial, the activities and operations of houses of worship, even if strictly socially distanced and limited to one or two hours,  have been subjected to stricter capacity and numerical limits as compared to Critical Businesses, Non-Critical Retail, and Non-Critical Office-Based businesses, even though houses of worship are listed as Critical Businesses in the same orders.

208.    For example, under Level 1 of the PHO 20-35 Safer at Home Dial, which restricts the activities of houses of worship to the lesser of 50% capacity or 175 people per room, AWMI cannot conduct a one-hour worship service in its 3,100-seat auditorium with more than 175 people, even though 50% of just its seating capacity would be over 1,500 people. By contrast, other Critical Businesses in facilities of the same capacity can operate with no numerical limit for unlimited periods of time, and both Non-Critical Retail and Non-Critical Office-Based Businesses can operate at 50% capacity with no numerical cap for unlimited periods of time.

209.    Under Level 2 of the PHO 20-35 Safer at Home Dial, which restricts the activities of houses of worship to the lesser of 50% capacity or 50 people per room, or 100 people per room if "extra large" (though that term is not defined), AWMI cannot conduct a one-hour worship service in its 3,100-seat auditorium with more than 50 (or possibly 100) people, even though 50% of just its seating capacity would be over 1,500 people. By contrast, other Critical Businesses in facilities of the same capacity can operate with no numerical limit for unlimited periods of time, and both Non-Critical Retail and Non-Critical Office-Based Businesses can operate at 50% capacity with no numerical cap for unlimited periods of time.

210.     Under Level 3 of the PHO 20-35 Safer at Home Dial, which restricts the activities of houses of worship to the lesser of 25% capacity or 50 people per room, AWMI cannot conduct a one-hour worship service in its 3,100-seat auditorium with more than 50 people, even though 25% of just its seating capacity would be 775 people. By contrast, other Critical Businesses in facilities of the same capacity can operate with no numerical limit for unlimited periods of time, and both Non-Critical Retail and Non-Critical Office-Based Businesses can operate at 50% capacity with no numerical cap for unlimited periods of time.

211.     For outdoor events such as receptions, fairs, auctions, outdoor markets, and concerts, the PHO 20-35 Stay at Home Dial automatically allows up to 250 people under Level 1, up to 175 under Level 2, and up to 75 under Level 3. But contrast houses of worship—under any Level—**must ask local government authorities for the number of people allowed to attend an outdoor worship service**.

**E.      THE GOVERNOR PUBLICLY AND UNEQUIVOCALLY SUPPORTED MASS PROTEST GATHERINGS THAT VIOLATED HIS ORDERS WHILE SIMULTANEOUSLY CONDEMNING AND PROHIBITING RELIGIOUS WORSHIP SERVICES.**

212.     On June 2, 2020, Governor Polis was asked about his thoughts on the thousands of protestors gathering in the streets in violation of his Orders, and he publicly, unequivocally, and adamantly supported their violation of his Orders.

213.     Specifically, Governor Polis said, "I see you, I hear you, I grieve with you, and more importantly, I want to work with you." *See* Sady Swanson, *Everyone at demonstrations should get coronavirus test, Colorado Gov. Polis says*, Coloradoan.com (June 2, 2020), *available at* https://www.coloradoan.com/story/news/2020/06/02/polis-coloradans-george-floyd-protests-should-get-coronavirus-test/3124088001/ (last visited September 21, 2020).

214.    Governor Polis excused the protesters' gathering in violation of his stay-at-home orders, stating, "**it is not possible to stay home, it is not possible to stay silent**." *See* Swanson, *supra* (emphasis added).

215.    Governor Polis publicly encouraged the protesters, stating at a news conference, "**I commend those who peacefully joined in the protests . . . .**" KOAA 5, *Gov. Polis addresses protests, gives update on COVID-19* (June 4, 2020), https://www.facebook.com/KOAA/videos/gov-polis-addresses-protests-gives-update-on-covid-19/567893600820020/ (emphasis added).

216.    Governor Polis publicly endorsed the protesters' "**righteous message, the pure message of justice and equality and reform**." KOAA 5, *supra* (emphasis added).

217.    The Governor justified not enforcing the gathering prohibitions against the protesters by stating, "**This is not China, this is not Tiananmen Square**," and, "**Exercising their First Amendment rights speech and gathering is a constitutionally protected right**." KOAA 5, *supra* (emphasis added).

218.    The Governor also said he was "**glad** to see the Denver Police Chief, join arm-in-arm with those who exercise their free speech to protest." *Id.* (emphasis added).

219.    And, despite his open encouragement of the protestors, the Governor admitted that "health experts tell me that [the protests] could result in hundreds of new [Covid-19] and untold pain, death, and suffering." *Id.*

220.    Nevertheless, knowing and admitting the risk of COVID-19 spread among the thousands of protesters, gathered in blatant violation of the Governor's Orders, the Governor took no action and threatened no enforcement, but rather publicly commended the protesters and excused their violations on First Amendment grounds.

221.   "With so many people in one area . . . it is a certainty that some were asymptomatic carriers of Covid-19," and noted that those protestors gathering were at high risk for the virus. *Id.*

222.   When speaking about the lack of enforcement against the protestors, Governor Polis said, "**Exercising their First Amendment rights speech and gathering is a constitutionally protected right**" *id.* (emphasis added), so he could not enforce his Orders against the protestors.

F.   **THE GOVERNOR'S UNEQUAL TREATMENT OF NON-RELIGIOUS GATHERINGS.**

223.   On June 1, 2020, thousands of protesters against alleged police brutality gathered in Denver, Colorado at the State Capitol, in violation of the Governor's Orders and without threat of criminal sanction, as depicted below:









Sady Swanson, *Everyone at demonstrations should get coronavirus test, Colorado Gov. Jared Polis says*, Coloradan.com (June 2, 2020, 4:19 PM), https://www.coloradoan.com/story/news/2020/06/02/polis-coloradans-george-floyd-protests-should-get-coronavirus-test/3124088001/.

224.    On May 29, 2020, in Civic Center Park in Denver, Colorado, **over 10,000** individuals gathered to protest in violation of the Governor's Orders and without threat of criminal sanction or penalty, as depicted below:



Sam Tabachnik, *10,000 expected at Denver protests for George Floyd on Saturday*, Greenley Tribune (May 30, 2020, 1:50 PM), https://www.greeleytribune.com/2020/05/30/george-floyd-denver-protests-day-3-saturday/.

225.   On June 7, 2020, thousands more gathered on Colfax Avenue in Denver in violation of the Governor's Orders without threat of criminal sanction or penalty, as depicted below:



Esteban L. Hernandez, *Student-focused Black Lives Matter march in Denver draws thousands to Colfax*, Denverite.com (June 7, 2020, 2:54 PM), https://denverite.com/2020/06/07/student-focused-black-lives-matter-march-in-denver-draws-thousands-to-colfax/.

226.    Also on June 7, 2020, hundreds of students joined the Colfax Avenue protest in violation of the Governor's Orders without threat of criminal sanction or penalty, as depicted below:



Erica Breunlin, *Tragedy has prepared Colorado students for their next battle: police brutality and racism*, ColoradoSun.com (June 8, 2020, 3:20 AM), https://coloradosun.com/2020/06/08/colorado-students-george-floyd-protests/.

227.   On May 31, 2020, large crowds of protesters gathered in Colorado Springs in violation of the Governor's Orders without threat of criminal sanction or penalty, as depicted below:



Lance Benzel, *Colorado Springs mayor commends peaceful demonstrations; Sunday protests stretch into the night*, The Gazette (July 9, 2020), https://gazette.com/news/local/colorado-springs-mayor-commends-peaceful-demonstrations-sunday-protests-stretch-into-the-night/article_2cd325dc-a369-11ea-9fd5-03226c32876b.html.

228.   In late June, hundreds (if not thousands) of individuals gathered in violation of the Governor's Orders and even blocked traffic on Interstate 225 without threat of criminal sanction or penalty, as depicted below:



Angela Ufheil, *6 Drivers Have Hit Colorado Protesters With Vehicles This Year*, 5280.com (Sept. 24, 2020), https://www.5280.com/2020/08/5-drivers-have-hit-protesters-with-vehicles-this-summer/.

229. On January 19, 2020, thousands more gathered again at Civic Center Park to protests in violation of the Governor's Orders without threat of criminal sanction or penalty, as depicted below:



Shelly Bradbury, *Anti-police protestors mob rally supporting law enforcement in Denver's Civic Center*, The Denver Post (July 19, 2020), https://www.denverpost.com/2020/07/19/pro-police-rally-denver-cific-center-counter-protest/.

230.    On June 14, 2020, hundreds more protestors gathered in Denver, Colorado yet again, and again were not threatened with criminal penalty or sanction despite being in blatant violation of the Governor's Orders, as depicted below.





Taylor Allen, *Pride Meets Black Lives Matter in Sunday March in Denver and Draws Hundreds*, CPR News (June 14, 2020), https://www.cpr.org/2020/06/14/pride-meets-black-lives-matter-in-sunday-march-in-denver-and-draws-hundreds.

231.    The protests gathering in blatant violation of the Governor's Orders were not a temporary moment in time, such protests continued the week before the filing of this Complaint, with hundreds gathering in Thornton, Colorado and without threat of criminal sanction or threat of punishment, as depicted below:





Shelly Bradbury, *Black Lives Matter march in Westminster draws about 100 people, counter-protesters*, The Denver Post (Sept. 13, 2020, 4:04 PM), https://www.denverpost.com/2020/09/13/black-lives-matter-protest-westminster-sunday/.

232.    Yet, despite the fact that thousands of protestors have gathered in flagrant disregard for the Governor's restrictions on in-person gatherings without threat of criminal sanction or penalty, AWMI's religious gatherings are not given the same treatment, are threatened with criminal penalties for exercising their free assembly, free exercise, and free speech rights.

**G.    STATE OFFICIALS HAVE THREATENED AWMI WITH LEGAL ACITON FOR VIOLATING THE GOVERNOR'S ORDERS AND DIRECTIVES.**

233.    Like many Churches and individuals in Colorado, AWMI was initially willing to give the benefit of the doubt to the Governor and attempt to help with what were initially deemed "temporary" restrictions, and ceased operations to comply with such dictates.

234.    But, as it became apparent that "temporary" measures were going to extend indefinitely, that AWMI's religious ministries, events, activities, and exercise would remain prohibited seemingly in perpetuity, and that other non-religious gatherings were being permitted without restriction, on May 26, 2020, Andrew Wommack (along with 702 pastors and ministry leaders) sent a letter to Governor Polis and Defendant Ryan explaining that AWMI and the signatory Churches and ministers would begin exercising their constitutional rights to the free exercise of religion. A true and correct copy of the May 26 letter is attached hereto as **EXHIBIT MM** and incorporated herein.

235.    In that letter, Andrew Wommack noted that the Governor's prohibitions on gatherings of more than 10 people had "effectively ban[ned] all in person congregational worship" in the State of Colorado. EXHIBIT MM at 1. The letter went on to note that the Governor has exempted "oil and gas drillers, liquor stores, firearms stores, and marijuana dispensaries," and that such disparate treatment was unconstitutional. *Id.*

236.    As Andrew Wommack noted,

The assembly of our congregations to worship is not a luxury. We as pastors and religious leaders are bound by Scripture to come together on the Lord's day to worship. As the Bible says in Hebrews 10:24-25, "And let us consider one another to provoke unto love and to good works: Not forsaking the assembling of ourselves together, as the manner of some is; but exhorting one another: and so much more, as ye see the day approaching."

66

*Id.*

237.    Noting that its sincerely held religious beliefs compel it and that the First Amendment protects it, Andrew Wommack informed the Governor that "on Pentecost Sunday, May 31, 2020, in solidarity with thousands of other churches around the country, we will resume our church gatherings," and that even if the Governor's Orders did not permit it, "we will still exercise our constitutional rights to gather in obedience to our Lord's commands." *Id.*

238.    Despite knowing that no action had been taken against protestors and that AWMI's ministries, events, and gatherings had been engaging in social distancing, proper hygiene, and other preventative measures, on July 2, 2020, the Office of the Attorney General sent a cease and desist letter to AWMI, threatening legal action against AWMI for exercising its religious beliefs. A true and correct copy of the letter is attached hereto as **EXHIBIT NN** and incorporated herein.

239.    The Colorado Attorney General stated: "**you are directed to immediately cease hosting events that violate the terms of the executive order, the public health order, and the approved Teller County variance**." EXHIBIT NN at 2 (emphasis added). The letter made clear that the threatened sanction for such purported violations of the Governor's Orders would apply to all future events that AWMI may host during the continuation of the Governor's prohibitions on religious gatherings.

240.    In the Attorney General's letter, he threatens AWMI with legal action to obtain injunctive relief and a temporary restraining order should AWMI not immediately cease alleged violations of the Governor's Orders. *Id.*

241.    On July 3, 2020, Liberty Counsel, as counsel for AWMI, sent a letter to the Office of the Attorney General explaining that the Governor's Orders were not being enforced equally

against numerous non-religious protest gatherings and that such disparate treatment of AWMI's religious gatherings was unconstitutional. A true and correct copy of Liberty Counsel's letter to the Office of the Attorney General is attached hereto as **EXHIBIT OO** and incorporated herein.

242.   Liberty Counsel's response letter noted that it was voluntarily capping its attendance at 50% capacity for its events, that it was engaging in social distancing, personal hygiene, and other safety precautions, and that it had submitted plans to the Teller County Health Department concerning the proposed events. EXHIBIT OO at 1.

243.   Liberty Counsel's letter also indicated that the Governor's draconian and discriminatory prohibitions targeting AWMI's religious gatherings while simultaneously permitting massive protestors and demonstrations was unconstitutional and urged the Governor and Attorney General to reconsider its threatened legal action against AWMI. EXHIBIT OO at 6.

244.   In addition to the threats AWMI received from the Governor and his Attorney General, on July 3, 2020, AWMI also received a communication from the Teller County Attorney discussing AWMI's religious gatherings, events, conferences, and activities. A true and correct copy of the Teller County Attorney letter is attached hereto as **EXHIBIT PP** and incorporated herein.

245.   Teller County did not specifically threaten AWMI with legal action but noted that the County was deferring response on AWMI's legal position concerning the discriminatory treatment of religious gatherings to the Colorado Attorney General. EXHIBIT PP at 1.

246.   To date, neither the Governor nor Teller County has withdrawn their threatened enforcement against AWMI.

H.     **AWMI HAS COMPLIED WITH SOCIAL DISTANCING AND PERSONAL HYGIENE PROTOCALS.**

247.    Despite the numerous instances of protesters' gathering by the thousands, engaging in shouting and loud singing and chanting, without social distancing, and without threat of criminal sanction, AWMI still faces criminal penalties and threatened legal action despite its complying with extensive social distancing and personal hygiene protocols that were wholly absent from the mass protests Governor Polis encouraged, applauded, and blessed.

248.    Irrespective of the distancing and sanitization protocols encouraged by the Governor's Orders with respect to "Critical Business" and other non-religious activities and operations, AWMI has and exercises the sincere religious belief that it should protect the well-being of its ministers, pastors, employees, staff, students, volunteers, and attendees at its religious events, conferences, meetings, and worship services.

249.    In accordance with its sincere religious belief, AWMI has self-imposed significant safety protocols for all of its activities and operations.

250.    AWMI has required all of its staff and volunteers to wear masks and has prohibited employees and staff who have symptoms or who have tested positive for COVID-19 from working at any of its events.

251.    AWMI's staff and volunteers, including ushers and greeters are required to wear masks at all AWMI religious events, conferences, meetings, or worship services.

252.    All food service vendors or workers, prayer ministers, or product sales or resource distribution personnel are required to wear gloves and masks at all AWMI religious events, conferences, meetings, or worship services.

253.     All parking lot attendants are required to wear masks at all AWMI religious events, conferences, meetings, or worship services.

254.     All employees, staff, and volunteers are instructed and required to wash their hands frequently throughout the day at all AWMI religious events, conferences, meetings, or worship services.

255.     Ushers are stationed at entrances to AWMI facilities at all AWMI religious events, conferences, meetings, or worship services and are tasked with holding the door open so that attendees need not contact the door handle, and to discourage multiple cars from unloading simultaneously at the entrances.

256.     Signs are posted on entrances encouraging social distancing and face masks at all AWMI religious events, conferences, meetings, or worship services.

257.     Signs are posted informing guests and attendees to refrain from entering AWMI facilities if they have experienced symptoms or tested positive for COVID-19.

258.     Sanitization stations are posted throughout AWMI facilities with signs reminding attendees to engage in social distancing and personal hygiene practices.

259.     Prior to entering AWMI's events, attendees and guests are required to go through the Health Screening Stations, which outline social distance markers and requirements, screen attendees and guests for temperature with a contactless infrared thermometer, and asked health questions.

260.     AWMI established a schedule for the frequent cleaning of all shared surfaces, restrooms, and other high touch surfaces using a hospital grade disinfectant.

261.    AWMI engages in intense sanitizing and disinfecting of all event spaces between sessions.

262.    In addition to the extensive precautions, social distancing, enhanced sanitization, and other protocols, AWMI has taken extensive precautions with respect to its day-to-day operations as well to ensure that its facilities remain properly sanitized for upcoming events.

263.    AWMI reduced its on-site staff to only "essential" personnel, which was approximately 18% of its total employee staff prior to classes resuming, and has required all others to work remotely from home.

264.    AWMI has imposed temperature checks and health screenings at the entrances to its facilities each day for both employees and guests of AWMI. AWMI requires its employee to wear masks unless seated at their desk. For meetings in conference rooms, AWMI has limited the number of persons who occupy a conference room at any given time.

265.    AWMI has also professionally sanitized its entire facility twice.

266.    AWMI took the utmost precaution with regard to the safety and health of its ministers, employees, staff, volunteers, guests, and attendees, and is committed to continuing to engage in such safety and health measures to ensure the protection of all at AWMI events, conferences, ministries, and religious services.

267.    AWMI objects to the arbitrary and discriminatory numerical limitations that are placed on its religious events, conferences, ministries, and services that are not imposed on similarly situated non-religious gatherings.

## I.     LESS RESTRICTIVE ALTERNATIVES ARE AVAILABLE TO THE GOVERNOR.

268.     Despite Governor Polis's insistence that houses of worship cannot conduct in-person religious gatherings without capacity and numerical limitations in Colorado, the Governor has failed to consider other, substantially less restrictive alternatives.

269.     The State of Indiana has issued stay-at-home executive orders and required the closure of all so-called "non-essential" businesses without unnecessarily discriminating against religious gatherings. Governor Eric. J. Holcomb's Executive Order 20-08 declared that "[r]eligious facilities, entities and groups, and religious gatherings" are essential and may continue to operate provided they follow appropriate social distancing and personal hygiene practices. A true and correct copy of Indiana's Executive Order 20-08 is attached hereto as **EXHIBIT QQ** and incorporated herein.

270.     The State of Alabama, in its final Order of the State Health Officer Suspending Certain Public Gatherings Due to Risk of Infection by COVID-19, issued April 3, 2020, exempts individuals attending religious worship services in person subject to certain requirements and permits "drive-in" worship services without limitation. A true and correct copy of the Alabama Order is attached hereto as **EXHIBIT RR** and incorporated herein.

271.     The State of Arkansas has likewise exempted "places of worship" from its Executive Order 20-13 imposing restrictions to prevent the spread of COVID-19, provided that they engage in adequate social distancing and personal hygiene practices. A true and correct copy of the Arkansas Executive Order is attached hereto as **EXHIBIT SS** and incorporated herein.

272.     The State of Ohio has likewise issued certain COVID-19 orders, including the Ohio Department of Health's Stay Safe Ohio Order. A true and correct copy of the Ohio order is attached

hereto as **EXHIBIT TT** and incorporated herein. Ohio's order likewise states that the stay at home mandate "does not apply to religious facilities, entities and groups and religious gatherings."

273.    The State of Illinois, though initially one of the strictest states on religious gatherings, completely eliminated all restrictions on religious gatherings due to various lawsuits and challenges to its draconian measures. A true and correct copy of the Illinois Order removing all restrictions on religious worship is attached hereto as **EXHIBIT UU** and incorporated herein.

274.    The State of Florida has issued stay-at-home executive orders and required the closure of all so-called "non-essential" businesses without unnecessarily discriminating against religious gatherings. On April 1, 2020, Florida Governor Ron DeSantis issued Executive Order 20-91, which included "religious services conducted in churches, synagogues, and houses of worship" as essential activities permitted to continue subject to social distancing and personal hygiene guidelines. A true and correct copy of Florida Executive Order 20-91 is attached hereto as **EXHIBIT VV** and incorporated herein.

275.    The State of Arizona, in Executive Order 2020-18, classified "[e]ngaging in constitutionally protected activities such as speech and religion" as essential activities, subject to a flexible requirement that such engagement be "conducted in a manner that provides appropriate physical distancing to the extent feasible." The Arizona Attorney General, in Opinion I20-008, interpreted such essential activities clearly to include assembling for religious worship. True and correct copies of Arizona Executive Order 2020-18 and Arizona Attorney General Opinion I20 008 are attached hereto as **EXHIBIT WW** and **EXHIBIT XX**, respectively, and incorporated herein.

276.     The State of Texas has likewise issued certain COVID-19 orders, but has provided explicit protections to religious gatherings and issued directives outlining the protection for religious freedom, even in these times of uncertainty. A true and correct copy of the Texas Guidance for Houses of Worship is attached hereto as **EXHIBIT YY** and incorporated herein. In that Guidance, Texas notes that religious assemblies and houses of worship are "essential services" and that in-person gatherings are permissible if social distancing and personal hygiene practices are followed.

277.     Numerous other states have similarly permitted religious gatherings to be treated equally with non-religious gatherings, and have exempted them altogether from the restrictions being placed on their constitutionally protected exercise of religion. And, the State of South Dakota refused to place any restrictions on gatherings of any kind or to prohibit individuals in that state from attending religious gatherings.

278.     As these other states have demonstrated, Governor Polis can continue to pursue the State's objective of preventing the spread of COVID-19 without unnecessarily treating religious gatherings in a discriminatory manner, and the State has numerous other, less restrictive alternatives available to it to do so.

279.     Governor Polis has neither tried without success nor considered and ruled out for good reason these less restrictive alternatives.

280.     Governor Polis has constitutionally permissible alternatives available, but has failed to attempt to achieve the State's purported goals without unnecessarily interfering with constitutionally protected activities.

**J.    AWMI HAS SUFFERED, IS SUFFERING, AND WILL CONTINUE TO SUFFER IRREPARABLE AND UNCONSCIONABLE INJURY FROM THE GOVERNOR'S ORDERS AND DISCRIMINATORY ENFORCEMENT.**

281.    Despite being willing and capable of following all social distancing and sanitization protocols recommended by the CDC and the Governor's Orders, and despite going above and beyond those requirements for its religious activities and operations, AWMI has been subject to criminal sanction and explicitly targeted, singled out, and threatened with legal action for conducting worship-based religious gatherings when exempted "Critical Businesses" and other non-religious activities and operations may accommodate gatherings, crowds, and masses of people without numeric limitation, and without scrutiny or punishment by the government, and when ostensibly prohibited mass protest gatherings with no social distancing whatsoever are commended and excused by the Governor.

282.    As a result of the Governor's Orders, and blatantly selective enforcement of his orders, AWMI has suffered and is suffering irreparable injury from the weight and threat of criminal enforcement of the Governor's Orders against its ministries, ministers, pastors, and event attendees for merely engaging in responsibly distanced and sanitized religious worship services and religious gatherings.

283.    As a result of the Governor's Orders, and blatantly selective enforcement of his orders, AWMI has suffered and is suffering irreparable injury from the weight and threat of criminal enforcement of the Governor's Orders against its ministries, ministers, pastors, and event attendees for merely engaging in responsibly distanced and sanitized religious worship services and gathering involving more than 175 people per space, regardless of whether its auditorium or event facilities can accommodate much higher numbers while maintaining distancing.

284.     As a result of the Governor's order, AWMI has suffered and is suffering irreparable injury from being prohibited from freely engaging in its constitutionally protected rights of religious exercise, assembly, and speech.

285.     As a result of the Governor's Orders, AWMI has suffered and is suffering irreparable injury from the infringement of its constitutionally protected right to be free from government hostility toward religion.

286.     As a result of the Governor's Orders, AWMI has suffered and is suffering irreparable injury from the infringement of their constitutionally protected rights to be free from excessive government entanglement with how AWMI is permitted to engage in its religious exercise, what religious services and activities AWMI may offer to its attendees and the community, and what religious practices AWMI may engage in during its events and services.

287.     As a result of the Governor's Orders, AWMI has suffered and is suffering irreparable injury by the continuing threat of criminal sanctions against its ministries, ministers, pastors, and attendees for merely exercising its constitutionally protected freedoms.

288.     Due to the explicit threats of the Governor's Orders, AWMI has been forced to self-censor, cease certain aspects of its religious ministries, activities, and services, cease certain vital practices in its ministry, and violate its sincerely held religious beliefs.

289.     Due to the Governor's Orders and threats of sanction, AWMI has cancelled or modified the format of numerous events, conferences, meetings, gatherings, and ministries. To date, AWMI has cancelled or changed at least eight events to avoid sanction for merely engaging in their exercise of religion.

<u>**CONSTITUTIONAL CLAIMS**</u>

**COUNT I – THE GOVERNOR'S ORDERS VIOLATE PLAINTIFF'S RIGHTS TO FREE EXERCISE OF RELIGION UNDER THE FIRST AMENDMENT**

290.     AWMI hereby realleges and adopts each and every allegation in paragraphs 1–289 above.

291.     The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging Plaintiff's rights to free exercise of religion.

292.     AWMI has and exercises sincere religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that it is to follow its teachings.

293.     AWMI has and exercises sincere religious beliefs, rooted in Scripture's commands (*e.g.*, *Hebrews* 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. Indeed, the entire purpose of the Church (in Greek "ekklesia," meaning "assembly") is to assemble together Christians to worship Almighty God.

294.     The Governor's orders, on their face and as applied, target AWMI's sincerely held religious beliefs by prohibiting or numerically restricting religious gatherings and by imposing government-mandated restrictions on the types of religious activity Plaintiff may exercise in its own buildings.

295.     The Governor's orders, on their face and as applied, impermissibly burden AWMI's sincerely held religious beliefs, compel AWMI to either change those beliefs or to act in contradiction to them, and force Plaintiff to choose between the teachings and requirements of

its sincerely held religious beliefs in the commands of Scripture and the State's imposed value system.

296.    The Governor's orders, on their face and as applied, place AWMI in an irresolvable conflict between compliance with the Governor's orders and its sincerely held religious beliefs.

297.    The Governor's orders, on their face and as applied, put substantial pressure on AWMI to violate its sincerely held religious beliefs by ignoring the fundamental teachings and tenets of Scripture concerning the assembling of believers.

298.    The Governor's orders, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious beliefs, speech, assembly, and viewpoint of AWMI.

299.    By treating "Critical Businesses" and other comparable non-religious activities and operations differently than AWMI's religious activities and operations, the Governor has demonstrated his orders are not neutral

300.    By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders are not neutral.

301.    By treating "Critical Businesses" and other comparable non-religious activities and operations differently than AWMI's religious activities and operations, the Governor has demonstrated his orders are not generally applicable.

302.     By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders are not generally applicable.

303.     By treating "Critical Businesses" and other comparable non-religious activities and operations differently than AWMI's religious activities and operations, the Governor has demonstrated his orders create a system of individualized exemptions based upon the diminished value the Governor places on religious activities and operations.

304.     By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders create a system of individualized exemptions based upon the diminished value the Governor places on religious ministries and activities.

305.     By treating "Critical Businesses" and other comparable non-religious activities and operations differently than AWMI's religious activities and operations, the Governor has demonstrated his orders create an overt religious gerrymander of based upon the value judgments of the Governor.

306.     By treating mass gatherings of thousands of protesters differently from religious gatherings of substantially smaller numbers, the Governor has demonstrated his orders create a overt religious gerrymander of based upon the value judgments of the Governor.

307.     By permitting "Critical Businesses" and other comparable non-religious activities and operations without numerical restrictions while imposing numerical restrictions on AWMI's religious activities and operations, the Governor has demonstrated that his orders impose

substantially more burdensome restrictions on religious gatherings than on his approved non-religious gatherings.

308.    By permitting mass gatherings of thousands of protesters on more favorable terms than AWMI's events and gatherings of smaller numbers, the Governor has demonstrated that his orders impose substantially more burdensome restrictions on religious gatherings than on his approved non-religious gatherings.

309.    The Governor's orders, on their face and as applied, constitute a substantial burden on AWMI's sincerely held religious beliefs.

310.    By prohibiting AWMI and its ministries from gathering without adherence to certain numerical limitations, and from engaging in certain religious activities that are not approved by the Governor, the Governor has imposed an unconscionable and unconstitutional burden on AWMI's religious exercise according to its sincerely held beliefs.

311.    The State lacks a compelling, legitimate, or rational interest in the Governor's orders' application of different standards for religious ministries and religious gatherings than those applicable to exempted businesses, non-religious entities, and protesters.

312.    The State lacks even a rational basis to impose disparate treatment on AWMI's permissible non-religious activities (providing food, shelter, social services, and other necessities of life without numerical limitation) and educational activities (providing higher education programs at Charis Bible College without numerical limitation), and its impermissible religious worship services for the same number of people in the same building.

313.    The Governor cannot claim a compelling, legitimate, or even rational interest in his orders when he has commended and excused mass gatherings of thousands of protesters to

engage in the very activity he claims poses a massive danger to Colorado if it takes place in AWMI's events, ministries, and facilities, as that leaves an appreciable amount of purported damage unrestricted.

314.    Even if the Governor's orders were supported by a compelling, legitimate, or even rational interest, they are not the least restrictive means or otherwise narrowly tailored to accomplish the government's purported interest.

315.    The Governor's orders, on their face and as applied, fail to accommodate AWMI's religious exercise according to its sincerely held beliefs.

316.    The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause AWMI immediate and irreparable harm, and actual and undue hardship.

317.    AWMI has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, AWMI respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

### COUNT II – THE GOVERNOR'S ORDERS VIOLATE AWMI'S RIGHT TO PEACEABLY ASSEMBLY UNDER THE FIRST AMENDMENT

318.    AWMI hereby realleges and adopts each and every allegation in paragraphs 1–289 above.

319.    The First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging the right of the people peaceably to assemble.

320.    The Governor's orders, on their face and as applied, are an unconstitutional prior restraint on AWMI's right to assemble.

321.    The Governor's orders, on their face and as applied, unconstitutionally discriminate against AWMI's assembly on the basis of viewpoint.

322.    The Governor's orders, on their face and as applied, unconstitutionally discriminate against AWMI's assembly on the basis of content.

323.    By expressly commending and excusing protesters expressing particular content of a particular viewpoint while prohibiting the religious content of AWMI's events, gatherings, and services, the Governor has discriminated against AWMI's assembly on the basis of content and viewpoint.

324.    The State lacks a compelling, legitimate, or rational interest in the Governor's orders' application of differential standards for religious events and religious gatherings than those applicable to exempted businesses, non-religious entities, and protesters.

325.    The Governor's orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

326.    The Governor's orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest in the orders.

327.    The Governor's orders, on their face and as applied, do not leave open ample alternative channels of communication for AWMI.

328.    The Governor's orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on AWMI's constitutionally protected right to assemble.

329.    The Governor's orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Defendants and their respective designees, to apply or not apply the Governor's orders in a manner to restrict free assembly.

330.    The Governor's favorably disparate treatment of protesters who engaged in assemblies of thousands without criminal sanction and at the express commendation and excuse of the Governor demonstrates that Defendants have unbridled discretion to apply or not apply his orders as they see fit.

331.    The Governor's Orders, on their face and as applied, are underinclusive by limiting the gathering prohibitions and restrictions to religious activities and operations while exempting "Critical Businesses" and other non-religious activities and operations and excusing protesters.

332.    The Governor's orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free assembly rights of AWMI.

333.    On their face and as applied, the Governor's orders violate AWMI's rights to free assembly and have caused, are causing, and will continue to cause AWMI to suffer immediate and irreparable injury and undue and actual hardship.

334.    AWMI has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, AWMI respectfully prays for the relief against Defendants as hereinafter set for in its prayer for relief.

**COUNT III – THE GOVERNOR'S ORDDERS VIOLATE AWMI'S RIGHT TO FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT**

335.    AWMI hereby realleges and adopts each and every allegation in paragraphs 1– 289 above.

336.    The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the State from abridging AWMI's freedom of speech.

337.    The Governor's orders, on their face and as applied, are an unconstitutional prior restraint on AWMI's right to free speech.

338.    The Governor's orders, on their face and as applied, unconstitutionally discriminate against AWMI's speech on the basis of viewpoint.

339.    The Governor's orders, on their face and as applied, unconstitutionally discriminate against AWMI's speech on the basis of content.

340.    By expressly commending and excusing protesters expressing particular content of a particular viewpoint while prohibiting the religious content of AWMI's religious events, gatherings, and services, the Governor has unquestionably discriminated against AWMI's speech on the basis of content and viewpoint.

341.    The State lacks a compelling, legitimate, or rational interest in the Governor's orders' application of differential standards for religious ministries and religious gatherings than those applicable to exempted businesses, non-religious entities, and protesters.

342.    The Governor's orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the orders.

343.    The Governor's orders, on their face and as applied, are not narrowly tailored to serve the government's purported interest.

344.    The Governor's orders, on their face and as applied, do not leave open ample alternative channels of communication for AWMI.

345.    The Governor's orders, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on AWMI's constitutionally protected right to free speech.

346.    The Governor's orders, on their face and as applied, impermissibly vest unbridled discretion in the hands of government officials, including Defendants and their respective designees, to apply or not apply the Governor's orders in a manner to restrict free speech.

347.    The Governor's favorably disparate treatment of protesters who engaged in assemblies of thousands without criminal sanction and with the express commendation and excuse of the Governor demonstrates that Defendants and their respective designees have unbridled discretion to apply or not apply the Governor's Orders as they see fit.

348.    The Governor's Orders, on their face and as applied, are underinclusive by limiting the gathering prohibitions and restrictions to religious activities and operations while exempting "Critical Businesses" and other non-religious activities and operations and excusing protesters.

349.    The Governor's orders, on their face and as applied, are unconstitutionally vague and overbroad as they chill and abridge the free speech rights of AWMI.

350.     On their face and as applied, the Governor's orders violate AWMI's right to free speech and have caused, are causing, and will continue to cause AWMI to suffer immediate and irreparable injury and undue and actual hardship.

351.     AWMI has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, AWMI respectfully prays for the relief against Defendants as hereinafter set for in its prayer for relief.

**COUNT IV – THE GOVERNOR'S ORDERS VIOLATE AWMI'S RIGHTS UNDER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT**

352.     AWMI hereby realleges and adopts each and every allegation in paragraphs 1– 289 above.

353.     The Establishment Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits the government from establishing a religion.

354.     The Establishment Clause also prohibits excessive government entanglement with religion.

355.     The Establishment Clause also prohibits the government from showing hostility towards religion and prohibits showing favoritism towards one religious sect over another or between non-religion and religion.

356.     The government-mandated prohibitions and restrictions on religious gatherings in the Governor's orders violates the Establishment Clause because the State of Colorado thereby dictates the manner in which Christians and religious ministries must worship, whether they may worship at all, and whether they may engage in religious events, gatherings, and activities.

357.    The Establishment Clause does not permit the State of Colorado to dictate under penalty of criminal sanctions the manner, style, form, practices, or sacraments of religious worship and thereby impose its own version of religious worship on every religious ministry, Church, event, and citizen of the State.

358.    The State, through Governor Polis's Orders, is purporting to prescribe what shall be orthodox in matters of religious worship, and is thus running roughshod over the Establishment Clause. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, **religion**, or other matters of opinion or force citizens to confess by word or act their faith therein." (emphasis added)).

359.    The Governor may not dictate how individuals gather together to worship the Lord, express their faith, minister to one another, and exercise their religious faith, regardless of the number of Believers present or whether they satisfy the Governor's proscription of religious orthodoxy and practice.

360.    The Governor's orders, on their face and as applied, display and permit government officials to display impermissible hostility towards religious gatherings, religious ministries, and religious events.

361.    The Governor's orders, on their face and as applied, have permitted mass gatherings of protesters while imposing disparate restrictions on the gathering of religious ministries, religious events, and religious worship services.

362.    The Governor's orders, on their face and as applied, impermissibly show favoritism towards certain non-religious gatherings, such as protests, over religious gatherings.

363.    The Governor's express statements of support and encouragement of protesters while imposing draconian prohibitions and restrictions on AWMI's worship services demonstrates the unquestionable government hostility toward AWMI's religious gatherings and worship services.

364.    The Governor's orders, on their face and as applied, violate the Establishment Clause because they excessively entangle the government with religion.

365.    By setting up a system of permissible nonreligious activities in AWMI's facilities and buildings (providing food, shelter, clothing, or other necessities of life without numerical restriction) and impermissible religious activities in a worship service, ministry event, or other gathering (gathering in excess of the prescribed numerical limitations), the Governor has excessively entangled Colorado with religious beliefs, teachings, and doctrine on proper expressions of faith in worship.

366.    By setting up a system whereby thousands of individuals may gather to protest without threat of criminal sanction while smaller groups of religious adherents cannot gather to engage in religious ministry, religious worship services, Bible studies, or religious events, the Governor has excessively entangled Colorado with religious beliefs, teachings, and doctrine on proper expressions of faith.

367.    The Governor's Orders, on their face and as applied, purport to inform religious adherents and believers how they may choose to worship, assemble together, or exercise their religious freedoms.

368.    The Governor's Orders, on their face and as applied, purport to establish an acceptable method of religious practice, ministry, and worship, place a numerical limitation on

the scope of how such religious practice, ministry, and worship may occur, and provide a government imprimatur for only certain forms of "permissible" practice, ministry, and worship.

369.    The Governor's Orders, on their face and as applied, demonstrate overt hostility to religious practice, ministry, and worship that does not conform to government sanctioned religious exercises.

370.    By explicitly and publicly stating his belief that it was impossible for protesters to stay home instead of marching together by the thousands while continuing to call religious gatherings non-essential and impermissible, the Governor has demonstrated hostility towards those religious adherents that believe it is impossible and sinful for them to forsake the assembling of themselves together for worship, ministry, and events.

371.    The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause Plaintiff immediate and irreparable harm, and actual and undue hardship.

372.    AWMI has no adequate remedy at law to correct the continuing deprivation of its most cherished constitutional liberties.

WHEREFORE, AWMI respectfully prays for relief against Defendant as hereinafter set forth in its prayer for relief.

### COUNT V – THE GOVERNOR'S ORDERS VIOLATE AWMI'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT

373.    AWMI hereby realleges and adopts each and every allegation in paragraphs 1–289 above.

374.    The Fourteenth Amendment to the United States Constitution guarantees Plaintiff the right to equal protection under the law.

375.    The Governor's Orders, on their face and as applied, are an unconstitutional abridgement of AWMI's right to equal protection under the law, are not neutral, and specifically target AWMI's and other religious gatherings, ministries, and events for unequal treatment.

376.    The Governor's Orders, on their face and as applied, are an unconstitutional abridgment of AWMI's right to equal protection because they permit the State to treat AWMI's differently from other similarly situated businesses, non-religious entities, and protesters on the basis of the religious content and viewpoint of AWMI's gatherings, ministries, and events.

377.    The Governor's Orders create a system of exempt categories that permit "Critical" businesses and activities, and protesters, to gather without restriction or threat of criminal penalty while imposing disparate treatment on AWMI's religious ministries, events, and worship services.

378.    By explicitly and publicly declaring support for mass gatherings of protesters in flagrant violation of his own orders and asking that hey continue, while at the same time imposing draconian prohibitions on AWMI's religious ministries, events, and services, the Governor has created a class of prohibited gatherings without any rational, legitimate, significant, or compelling interest.

379.    The Governor's system of categories represents disparate treatment based upon classifications in violation equal protection.

380.    The Governor's Orders, on their face and as applied, impermissibly discriminate between certain non-religious gatherings and religious gatherings.

381.   The State lacks a compelling, significant, legitimate, or rational interest in the Governor's orders' application of different standards for religious ministries, events, and gatherings from those applicable to exempted businesses, non-religious activities, and protesters.

382.   The Governor's Orders, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served.

383.   The Governor's Orders, on their face and as applied, do not have a rational basis.

384.   The Governor's Orders, on their face and as applied, are irrational and unjustifiable and impose irrational and unjustifiable restrictions on AWMI's religious ministries, events, and gatherings.

385.   The Governor's Orders, on their face and as applied, have caused, are causing, and will continue to cause AWMI immediate and irreparable harm, and actual and undue hardship.

386.   AWMI has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, AWMI respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

### COUNT VI – THE GOVERNOR'S ORDERS VIOLATE THE GUARANTEE CLAUSE OF ARTICLE IV, SECTION 4 OF THE UNITED STATES CONSTITUTION

387.   AWMI hereby realleges and adopts each and every allegation in paragraphs 1-289 above.

388.   Article IV, § 4 of the United States Constitution requires the United States to guarantee to every citizen in the nation a republican form of government.

389.    The Guarantee Clause's distinguishing feature is that the republican form of government it guarantees is the right of the people to choose their own governmental administration and pass their own laws.

390.    As interpreted by the federal judiciary and prominent scholars, the Guarantee Clause mandates that the federal government guarantee a form of government for all citizens in which supreme power resides in a body of citizens entitled to vote and exercised by elected officers responsible to such citizens.

391.    The Governor's orders' express, unilateral, and unequivocal exercises of purported executive authority over the constitutional rights of AWMI deprive AWMI of the right to select its own government administration, pass its own laws, and maintain a government administration directly responsible to the people, including by laws that are enacted by the legislature in constitutional recognition of the separation of powers.

392.    The impermissible exercise of exclusive and unaccountable executive authority— in perpetuity—violates the Guarantee Clause of the United States Constitution.

393.    The Governor's orders, on their face and as applied, have caused, are causing, and will continue to cause AWMI immediate and irreparable harm, and actual and undue hardship.

394.    AWMI has no adequate remedy at law to correct the continuing deprivation of its most cherished liberties.

WHEREFORE, AWMI respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

## **PRAYER FOR RELIEF**

WHEREFORE, AWMI prays for relief as follows:

A.     That the Court issue a temporary restraining order, restraining and enjoining Governor Polis, Director Ryan, and Director Revello, their respective officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with the Governor's Orders (in their current form) and any future order amending, extending, or superseding any of them to the extent any such order prohibits or restricts AWMI's religious activities, events, or worship services at AWMI's facilities if AWMI meets the social distancing and sanitization requirements otherwise acceptable for so-called "Critical Businesses" and other non-religious activities and operations not subject to such prohibitions or restrictions. To be clear, AWMI does not seek a complete exemption from social distancing or sanitization requirements which Defendants have effectively granted to mass gatherings of protesters, even though the Constitution demands equal treatment; rather, **AWMI seeks a TRO preventing AWMI and its ministers, pastors, employees, students, volunteers, and attendees from being subject to criminal sanctions or legal action for participating in indoor religious worship services, events, and activities during which AWMI will comply with social distancing and sanitization requirements imposed on "Critical Businesses" and other non-religious activities and operations which are not subject to capacity or numerical restrictions.**

B.     That the Court issue a preliminary injunction pending trial, and a permanent injunction upon judgment, restraining and enjoining Governor Polis, Director Ryan, and Director

Revello, their respective officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from enforcing the Governor's Orders so that:

i.      Defendants and their respective designees will not apply the Governor's Orders in any manner as to infringe AWMI's constitutional rights by discriminating against its right to assembly, speech, free exercise of religion, equal protection, and all other constitutional rights outlined herein;

ii.     Defendants and their respective designees will apply the Governor's Orders in a manner that treats AWMI's religious gatherings on equal terms as gatherings for or in so-called "Critical Businesses" and other non-religious activities and operations that are not subject to the prohibitions in the Governor's Orders;

iii.    Defendants and their respective designees will permit AWMI'S religious gatherings so long as they comply with the same social distancing and sanitization requirements otherwise acceptable for so-called "Critical Businesses" and other non-religious activities and operations allowed to accommodate gatherings of persons without numerical limit under the Governor's Orders;

iv.     Defendants and their respective designees will permit AWMI the opportunity to comply with any requirements of any future order or legal directive amending, extending, or superseding any of the Governor's Orders imposed as a condition to operating without capacity or numerical limits on the same terms as so-called "Critical Businesses" and other non-religious activities and operations allowed to accommodate gatherings of persons without capacity or numerical limits;

v.      Defendants and their respective designees will cease threatening criminal sanctions or other legal action against AWMI and its ministers, pastors, employees, students, volunteers, and attendees at its events; and

vii.     Defendants and their respective designees will not bring any criminal, public health, or other enforcement actions against AWMI as threatened in the Governor's Orders, public statement, or communications of Defendants and their respective designees.

C.      That the Court enter a judgment declaring that the Governor's Orders, both on their face and as applied, are unconstitutional under the United States Constitution, and further declaring that:

i.      Defendants have violated AWMI's right to freedom of assembly by impermissibly prohibiting and restricting religious gatherings;

ii.     Defendants have violated AWMI's right to freedom of speech by impermissibly prohibiting and restricting religious gatherings;

iii.    Defendants have violated AWMI's right to free exercise of religion by impermissibly prohibiting and restricting religious gatherings, by substantially burdening AWMI's religious exercise according to its sincerely held beliefs, by applying gathering criteria that are neither neutral nor generally applicable as to religious and non-religious gatherings, by establishing a religious gerrymander against religious gatherings, by establishing a system of individualized exemptions that exclude similarly situated non-religious gatherings from the prohibitions and restrictions applicable to AWMI's religious gatherings, and by imposing government directives on the manner in which AWMI may

conduct its religious operations and activities without abiding by disparately imposed numerical limitations;

iv.     Defendants have violated AWMI's right to equal protection of the laws by impermissibly prohibiting religious gatherings, and by applying criteria that treats religious gatherings in a discriminatory and dissimilar manner as those applied to various businesses, non-religious entities, and protesters;

v.     Defendants have violated the Establishment Clause by impermissibly demonstrating hostility towards religious gatherings and by impermissibly showing favoritism to certain non-religious gatherings, including mass protests; and

vi.     Defendants have violated the Guarantee Clause by impermissibly exercising executive authority in an unconstitutional manner.

D.     That the Court award AWMI nominal damages for the violation of AWMI's constitutional rights.

E.     That the Court adjudge, decree, and declare the rights and other legal relations within the subject matter here in controversy so that such declaration shall have the full force and effect of final judgment.

F.     That the Court retain jurisdiction over the matter for the purposes of enforcing the Court's order.

G.     That the Court declare AWMI is a prevailing party and award AWMI the reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988.

H.      That the Court grant such other and further relief as the Court deems equitable and just under the circumstances.

Respectfully submitted,


/s/ Daniel J. Schmid
Mathew D. Staver
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 504774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@LC.org – hmihet@LC.org
           rgannamLC.org – dschmid@LC.org

*Attorneys for Plaintiff*

*Applications for admission forthcoming

## **VERIFICATION**

I, Andrew Wertz, am over the age of eighteen years and am the Senior Vice President of Plaintiff Andrew Wommack Ministries, Inc. The statements and allegations that pertain to Plaintiff Andrew Wommack Ministries, Inc. or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Colorado, that the foregoing statements are true and correct to the best of my knowledge.

Dated: September 28, 2020


/s/ Andrew Wertz
Andrew Wertz

Plaintiff Andrew Wommack Ministries, Inc.
1 Innovation Way, Suite B
Woodland Park, CO 80863
P.O. Box 3333
Colorado Springs, CO 80934